**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| DR. PATRICIA BADER, M.D., | ) | |
| NORTHEAST INDIANA GENETIC | ) | |
| COUNSELING CENTER, P.C., | ) | |
| A.K. through her guardian and | ) | |
| representative Perla Graber, | ) | |
| C.K. through his guardian and | ) | |
| representative Perla Graber, | ) | |
| P.D. through his guardian and | ) | |
| representative Cynthia Church, and | ) | |
| A.W., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CAUSE NO.: 1:15-CV-375-TLS |
| | ) | |
| JOHN J. WERNERT, M.D., in his official | ) | |
| capacity as Secretary of the Indiana Family and | ) | |
| Social Services Administration, and JOE MOSER, | ) | |
| in his official capacity as Director of Medicaid | ) | |
| for the Indiana Family and Social Services | ) | |
| Administration, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This case involves several plaintiffs seeking to enjoin the actions of Dr. John J. Wernert and Joe Moser, who are the officials in the Indiana Family and Social Services Administration (FSSA) charged with overseeing Indiana's Medicaid program (the "Defendants"). The plaintiffs include healthcare providers Dr. Patricia Bader and the Northeast Indiana Genetic Counseling Center, P.C. (the "Providers"), and several patients: P.D., through his guardian and representative, Cynthia Church; A.W.; and A.K. and C.K., each through their guardian and

representative, Perla Graber (the "Patients").[1] On December 10, 2015, the Plaintiffs filed a

motion requesting that this Court enjoin FSSA from (1) "terminating the Providers from the

Indiana Medicaid program and" (2) "continuing to block all payments owed to the Providers for

claims submitted over a two-year period through the placement of the Providers in the so-called

'Medicaid Prepayment Review Program.'"[2] (Pls.' Mot. TRO & Prelim. Inj. 18, ECF No. 2.)  On

December 16, 2015, the Court held an on-the-record, *ex parte* telephone conference with

Plaintiffs' counsel regarding the Temporary Restraining Order (TRO). However, upon being

notified that FSSA's counsel entered their appearances after the telephone conference started, the

Court continued the telephone conference. On December 17, 2015, the Court resumed the on-

the-record telephone conference with all parties participating, and as such, the request for a TRO

was rendered moot.

This matter is now before the Court on the Plaintiffs' Motion for Preliminary Injunction

[ECF No. 2]. The Plaintiffs bring all their claims under 42 U.S.C. § 1983. The Patients allege

that FSSA's decision to terminate Dr. Bader as a Medicaid provider, as well as FSSA's use of

prepayment review against the Providers, violates their statutory right to freely choose their

Medicaid provider. 42 U.S.C. § 1396a(a)(23). The Providers allege that FSSA has violated their

right to due process under the Fourteenth Amendment. The parties have fully briefed the issues

and the Court presided over a five-day evidentiary hearing that started on January 19, 2016, and

---

[1] Throughout the opinion the Defendants will be referred to as FSSA. The two groups of Plaintiffs bring separate claims, and will often be identified as Providers or Patients, rather than as Plaintiffs.
[2] Over the course of this litigation, the Plaintiffs have altered slightly their arguments supporting the preliminary injunction. This accounts for the evidence presented during the evidentiary hearing. Thus, although all the Plaintiffs' filings were carefully considered, the Plaintiffs' Brief in Support of Motion [ECF No. 39] and Proposed Findings of Fact and Conclusions of Law [ECF No. 40] were consulted to clarify ambiguities in the Plaintiffs' positions on the issues before this Court. The Providers also appear to have abandoned some subsidiary claims, which will be noted where appropriate.

ended on January 25, 2016. For the reasons set forth below, the Plaintiffs' Motion is granted in part, and denied in part. FSSA's without cause termination of Dr. Bader is preliminarily enjoined, but the Plaintiffs' other claims are denied.

## BACKGROUND

Dr. Bader is a physician who has an Indiana medical license. She is certified in pediatrics by the American Board of Pediatrics, and certified in clinical genetics and clinical cytogenetics by the American Board of Medical Genetics. In 1981, Dr. Bader founded Northeast Indiana Genetic Counseling Center (NIGCC). Since that time, Dr. Bader has been the president of NIGCC, as well as its primary physician. Through NIGCC, Dr. Bader provides patients with "genetic services including evaluation, genetic diagnostic services, counseling, management[,] and surveillance recommendations." (Dr. Bader Aff. 1, ECF No. 2-2.) NIGCC's office is located in Fort Wayne, Indiana, and its patients reside across the northern Indiana region, including the Fort Wayne metropolitan area. About 50 percent of NIGCC's patients reside in areas designated by the federal Health Resources and Services Administration as underserved and physician shortage areas.

Dr. Bader testified that NIGCC serves patients who have "muscular dystrophy, cystic fibrosis, Huntington's disease, Marfan Syndrome, hemochromatosis, chromosome abnormalities, autism, mental retardation, fetal alcohol syndrome, and many patients with birth defects that lead to disability." (Dr. Bader Aff. 3.) Throughout most of NIGCC's existence and Dr. Bader's career, she has been the only Medicaid-eligible provider of genetic services in northeastern and north central Indiana. However, from August 2013 through November 2015, NIGCC also employed Dr. Karl de Dios, who is a biochemical geneticist certified by the American Board of

Medical Genetics and Genomics. Dr. de Dios treated Medicaid patients while employed by NIGCC.[3] NIGCC also currently employs a nurse practitioner. Apart from NIGCC, in late 2015, northeastern Indiana gained another physician-geneticist. This geneticist is located in Topeka, Indiana, and is certified by the American Board of Medical Genetics and Genomics. Geneticists are also located in South Bend and Indianapolis. Dr. Bader testified that "[NIGCC's] patient population relies heavily on the Indiana state Medicaid program." (Dr. Bader Aff. 3.)

From 1981 through August 2013, Dr. Bader was the only full-time physician working at NIGCC. In June 2003, Joe Bader was hired as the office manager for NIGCC.[4] At that time, NIGCC's staff included Dr. Bader, Mr. Bader, "one full-time clerical person," and "a part-time person that came in one day a week . . . maybe a half a day." (Prelim. Inj. Hr'g Tr. vol. 3, 549:21–24.) Mr. Bader testified that, in 2003, NIGCC had overall revenue that was "not very steady," and ranged from $15,000 to $20,000 per month. (Hr'g Tr. vol. 3, 549:18–20.) Further, NIGCC treated "less than 1500" Medicaid patients, which represented "the majority" of the office's patients. (Hr'g Tr. vol. 3, 532:12–15, 551:1–2.) Two weeks after Mr. Bader joined NIGCC, he hired Lori Gomez to serve as the office's second billing provider. Gomez's primary job responsibility is to process medical claims after the medical providers treat patients and complete the billing sheets, which includes submitting claims to Medicaid for payment.[5]

Mr. Bader testified that, starting in 2003, NIGCC's practice grew exponentially. By 2013, revenues ranged from $80,000 to $100,000 per month, with "[o]ver 70 percent" of NIGCC's

---

[3] Dr. de Dios had to obtain a J-1 Waiver because he is a citizen of the Philippines. NIGCC applied for the waiver and paid the costs for the waiver process.
[4] Joe Bader is Dr. Bader's son. After graduating from college in 2000, Mr. Bader worked for mental healthcare providers where he interacted with patients. Mr. Bader joined NIGCC on short notice after the previous office manager abruptly resigned.
[5] Before joining NIGCC, Gomez worked in transportation management for seventeen years and had no medical office experience.

overall revenue coming from Medicaid payments. (Hr'g Tr. vol. 3, 550: 20–22.) Dr. Bader testified that when NIGCC had five practitioners on staff, it was treating about 10,000 patients per year and about 70 percent of the patients were on Medicaid. One of these practitioners included Dr. de Dios once he joined NIGCC in August 2013 as the second geneticist. NIGCC also had about nine non-practitioners on staff, meaning that it had a total of fourteen full- and part-time employees.

At NIGCC, Dr. Bader treats patients who request one-time appointments, as well as other patients who see her on a regular basis for continuing care. The Patients in this lawsuit fall into the latter category. P.D., who is twenty-eight years old, is diagnosed with "autism spectrum disorder, moderate mental disability, and anxiety." (Church Aff. 2, ECF No. 2-4.) Cynthia Church, who is P.D.'s biological mother and legal guardian, testified that he will need assistance all his life because he has a first-grade reading level and has low functioning skills. P.D. first received treatment from Dr. Bader when he was eight years old. Subsequently, P.D. stopped seeing Dr. Bader for an unspecified period of time, but he resumed seeing Dr. Bader around the time he turned eighteen. P.D. sees Dr. Bader and NIGCC about four times per year for routine check-ups, during which Dr. Bader usually prescribes medication to treat his autism spectrum disorder, moderate mental disability, and anxiety.

A.W. is eighteen years old and has seen Dr. Bader since he was eight years old. A.W. has appointments with Dr. Bader "once a month on average" for routine check-ups and he receives prescription medication. (A.W. Aff. 2, ECF No. 2-5.) A.W. has been diagnosed with "conduct disorder, mild retardation, attention deficit disorder, impulse control disorder, depression, withdrawal, lead poisoning, and sensory receptive disorder." (A.W. Aff. 2.) He also has seizures and hearing loss.

Dr. Bader and NIGCC also treat Perla Graber's adoptive children, A.K. and C.K, who are seventeen years old and thirteen years old, respectively. Perla Graber, as the legal guardian of A.K. and C.K., testified on their behalf.[6] According to Ms. Graber, A.K. first saw Dr. Bader around fourteen years ago for her conditions, which include "fetal alcohol syndrome, anxiety, depression . . . [and] fetal cocaine diagnosis." (Hr'g Tr. vol. 2, 214:7–10.) A.K. sees Dr. Bader for routine check-ups, monthly prescriptions, and emergency care during acute episodes. This results in A.K. meeting with Dr. Bader three times per year, but the additional appointments with Dr. Bader for emergency care could increase the frequency of appointments to once a month. C.K. has fetal alcohol syndrome, Asperger's syndrome, and anxiety. Similar to A.K., Dr. Bader sees C.K. for routine check-ups, monthly prescriptions, and emergency care during acute episodes, and C.K. may meet with Dr. Bader as often as once a month. However, unlike A.K., C.K. "first began receiving care from Dr. Bader a few years ago. He subsequently switched to another provider" but "moved back to using Dr. Bader" "in the past year" because "we were happier with [her] care." (Graber Aff. 2, ECF No. 2-3.)

---

[6] Based on the parties' agreement, the Court permitted Graber to testify via telephone because she was outside the state on vacation, and this trip was planned before the hearing was set. After administering the oath, the Court asked the witness whether she had any papers in front of her that she was going to reference during her testimony. Graber gave an affirmative response. The Court then asked Plaintiffs' counsel if Graber would be relying upon information that he provided. At that time, Plaintiffs' counsel stated that this material was not an anticipated exhibit, and that he "went over the questions [he] was going to ask Ms. Graber and transcribed the answers she gave [him] per her request." (Hr'g Tr. vol. 2, 201:5–7.) Graber confirmed that this was the information in front of her. FSSA's counsel objected to this type of testimony and Plaintiffs' counsel stated that FSSA's counsel had not been provided with these questions and answers. Plaintiffs' counsel explained that this was not his usual practice, but Graber was nervous about testifying. The Court expressed its concern with this practice. Plaintiffs' counsel offered to provide FSSA's counsel with the questions and answers, which FSSA's counsel reviewed over a short recess. When proceedings resumed, FSSA's counsel expressed concern about the circumstances surrounding this witness's testimony, but nevertheless asked to proceed with the witness's testimony. With the parties in agreement, the Court reestablished connection with Graber. Plaintiffs' counsel asked Graber to fold the document so that she could not see it, which Graber stated that she did, and Graber's testimony proceeded.

The Patients have uniformly stated, either personally or through a guardian: (1) that their conditions "could have a genetic component to them" (Graber Aff. 3; Church Aff. 2; A.W. Aff. 2); (2) that they are happy with the care they receive from Dr. Bader and NIGCC; (3) that they would be upset if they could no longer see Dr. Bader; and (4) that they are unsure about whether they could provide their own transportation to see another geneticist, as well as whether their medical care would continue. Further, the Patients all receive some form of Medicaid that pays for their care from Dr. Bader.

Starting in late-2013, the Providers' interactions with FSSA changed. On October 28, 2013, FSSA issued a letter stating that, in accordance with 42 C.F.R. § 455.23, NIGCC had been placed on a payment suspension, which applied to "any and all Medicaid claims submitted by" NIGCC. (Pls.' Hr'g Ex. 1, at 1; Notice of Payment Suspension 1, ECF No. 2-6.) The letter informed NIGCC that the Office of Medicaid Policy and Planning instituted this temporary suspension because it received credible allegations of fraud. Specifically, that NIGCC "has billed codes with time components in excess of daily operating hours" and "has billed evaluation and management codes at the highest possible level at a higher rate than peers." (Pls.' Hr'g Ex. 1, at 1; Notice of Payment Suspension 1.)

That same day, FSSA also issued a second letter, which notified NIGCC that it had been placed on prepayment review. Prepayment review is a statewide surveillance and utilization control that "'[s]afeguards against unnecessary or inappropriate use of Medicaid services and against excess payments.'" (Pls.' Hr'g Ex. 2, at 2 (quoting 42 C.F.R. § 456.3).) A provider on prepayment review is not paid for a submitted claim until a prepayment review analyst has reviewed the claim to verify its accuracy. In contrast, a provider not on prepayment review has a claim paid without it being reviewed by a prepayment review analyst. A provider is removed

from prepayment review when their billing accuracy rate meets or exceeds 85 percent for three consecutive months. In other words, if 85 percent or more of the Providers' claims are approved over a three-month period, then they are no longer subject to FSSA's prepayment review team.

Although NIGCC was placed on prepayment review for all its Medicaid claims, the FSSA prepayment review team is only responsible for reviewing a portion of these claims. To the extent relevant here, Indiana Medicaid is separated into two categories: (1) traditional fee-for-service; and (2) managed care. The FSSA prepayment review team only reviews claims for Medicaid patients who receive traditional fee-for-service. Managed care entities (MCEs) administer claims for Medicaid patients who are on managed care. FSSA does not have oversight authority over MCEs. Further, MCEs have their own prepayment review teams to process NIGCC's claims, as well as their own rules for prepayment review. NIGCC's patient population includes Medicaid recipients who receive either traditional fee-for-service or managed care. Because MCEs are separate from FSSA, FSSA does not have data showing how many of NIGCC's patients are on managed care.[7]

On November 8, 2013, NIGCC timely filed a request for a stay and appeal of the payment suspension. On November 18, 2013, NIGCC was informed that FSSA decided not to grant the stay, but the appeal remained pending. The appeal was resolved on November 10, 2014, when FSSA lifted the payment suspension. Although NIGCC could now receive payment on claims it submitted, NIGCC remained on prepayment review. On May 13, 2015, FSSA issued a letter that notified NIGCC that it was terminated as a Medicaid provider. This notice of

---

[7] Although all the Patients receive Medicaid, only Ms. Graber testified that A.K. and C.K. receive traditional fee-for-service Medicaid. Ms. Church testified that a Medicaid waiver program covers P.D.'s care, but she could not state whether this fell within traditional fee-for-service. Similarly, although A.W. testified that he is a life-long Medicaid recipient, he did not identify whether he has traditional fee-for-service Medicaid.

termination, which Scott Gartenman[8] identified as a "for cause" termination, stated that NIGCC committed regulatory violations because its billing "included a lack of supporting documentation, incorrect procedure code billing, and a lack of evidence to prove physician involvement in claims billed." (Pls.' Hr'g Ex. 11, at 2.) Further, an FSSA audit revealed a claim error rate of 99.07 percent. NIGCC's claims reviewed through prepayment review had an error rate of 100 percent. Despite this "for cause" basis to terminate NIGCC's provider agreement, FSSA ultimately dismissed the termination after it learned that "the prepayment review team had . . . never signed and sent" a 12-month compliance document to NIGCC. (Gartenman Dep. 40:12–24, ECF No. 30.) Due to this oversight, FSSA allowed NIGCC to remain a Medicaid provider, and NIGCC resumed participating in prepayment review as of July 1, 2015.

On July 8, 2015, Dr. Bader received a notice stating that, pursuant to paragraph 39(b) of the Indiana Health Coverage Program Provider Agreement, FSSA would implement a without cause termination of her provider agreement in sixty days.[9] On July 10, 2015, Dr. Bader requested a stay of the without cause termination and an appeal. Following the sixty-day period, FSSA issued a notice stating that it was "exercising the option to terminate the provider agreement of Patricia Bader, MD without cause rendering Dr. Bader ineligible to participate in the Indiana Medicaid program." (Defs.' Hr'g Ex. T, at 1.) The termination was effective September 8, 2015, and the notice informed Dr. Bader of her right to appeal. On September 24,

---

[8] Mr. Gartenman is currently employed as a deputy general counsel for the Indiana Family and Social Services Administration. Previously, he was the provider relations director for Indiana's Office of Medicaid Policy and Planning, a position he held from February 2014 through October 2015.

[9] The letter sent to Dr. Bader had handwritten cross-outs over the date and tracking number, and a new handwritten date was included on the letter, along with the notation that this was the second mailing. Although the Plaintiffs note that this is confusing, Mr. Bader testified that NIGCC moved its office around this time and the notations on the document were made because of this move. The Plaintiffs have not otherwise contested that they received timely notice of FSSA's intent to exercise a without cause termination.

2015, Dr. Bader appealed her without cause termination.[10] This appeal is still pending before an administrative law judge. Therefore, Dr. Bader presently does not have a provider agreement with Medicaid, but NIGCC has an active provider agreement that is subject to prepayment review.

NIGCC's billing processor, Gomez, testified that the current process for submitting Medicaid claims imposes a burden on NIGCC. Before being placed on prepayment review, Gomez testified that upon receiving the data from the provider who treated the patient, it would take her about seven minutes to submit the form electronically. Generally, each claim would be approved within two hours of being submitted, and then NIGCC would receive the funds as part of a weekly deposit.

Under prepayment review, Gomez testified that it takes her more than thirty minutes to submit a claim. For each claim, Gomez compiles supporting documentation and mails it to Hewlett Packard, which is FSSA's fiscal agent and vendor that pays Medicaid providers. Hewlett Packard performs an initial review that may take up to thirty days, and then it forwards the claims to FSSA's prepayment review team. Once the FSSA prepayment review team receives a claim, an analyst reviews it to determine whether NIGCC accurately completed the claim. FSSA has an administrative, self-imposed goal to adjudicate or review a claim within sixty days. This time frame is not always met. According to NIGCC, it now takes several months for its claims to be approved and paid. If the FSSA prepayment review team denies a claim, NIGCC is notified through a document called a remittance advice. This document, which NIGCC receives weekly,

---

[10] On August 3, 2015, Dr. Bader filed a petition for review in state court. On January 14, 2016, this action was dismissed as premature. *Bader v. Ind. Family & Soc. Servs. Admin.*, No. 49D04-1508-MI-025727 (Marion Super. Ct., Civil Div. 4).

lists the specific reasons that each claim was denied. A single denial reason is sufficient to deny a claim.

NIGCC attributes many of its financial troubles to FSSA's prepayment review program. During the time NIGCC was on payment suspension, NIGCC continued to treat Medicaid patients and submit claims for reimbursement. An FSSA witness testified that her supervisor instructed the FSSA prepayment review staff not to adjudicate the claims of any providers that were on a payment suspension because the suspension meant the providers' claims would not be paid even if prepayment review approved one of their claims. Accordingly, the FSSA prepayment review team did not review NIGCC's claims for several months. However, the FSSA prepayment review team was still able to adjudicate 263 claims submitted by NIGCC during its suspension. Of these claims, 170 claims were reviewed in October 2014, which is the month before the payment suspension was lifted. The FSSA prepayment review team denied all these claims because each claim had a deficiency that warranted denial.

With the payment suspension no longer in place, the FSSA prepayment review team adjudicated claims at a consistent pace. From November 2014 to May 2015, the FSSA prepayment review team adjudicated 2255 claims submitted by NIGCC. Each claim was denied and a remittance advice was issued that stated the reason for each denial. NIGCC's claims often had four or five reasons for denial.[11] The first time the FSSA prepayment review team approved

---

[11] A letter sent from FSSA to NIGCC listed several common denial reasons specific to NIGCC. These reasons were: (1) "Documentation submitted does not support the level of CPT billed"; (2) "Incorrect procedure code"; (3) "RID (Recipient Identification) number is missing"; (4) "Documentation is not authenticated"; (5) "Documentation authenticated but not dated"; (6) "No medical history/review of system form submitted"; (7) "Medical history/review of system form is not signed and/or dated by service provider"; (8) "No physician order"; (9) "Missing or invalid modifier"; (10) "No documentation submitted with the claim as required"; and (11) "Documentation submitted does not match the date of service billed." (Notification of Prepayment Review 3, ECF No. 2-13.)

a claim from NIGCC was in June 2015. Subsequently, from June 2015 to December 2015, the FSSA prepayment review team has adjudicated 1555 claims submitted by NIGCC, of which 827 claims have been approved and 728 claims have been denied. Any denied claim may be resubmitted for payment after NIGCC corrects any identified deficiency. NIGCC regularly resubmits claims that the FSSA prepayment review team has denied.

Dr. Bader and the other NIGCC witnesses have repeatedly stated that FSSA's conduct has brought them to the brink of collapse. Specifically, Dr. Bader testified that she has spent several hundred thousand dollars to keep NIGCC operating, which includes funds held by the business and her personally, as well as business and personal lines of credit. Accordingly, Dr. Bader testified that she has exhausted all financial resources. Mr. Bader testified that NIGCC is struggling to operate and that Dr. Bader has not been paid her bi-weekly salary since 2015, which his "best guesstimate of take home" was "a couple thousand dollars." (Hr'g Tr. vol. 3, 671:19–24.) Since 2013, NIGCC's staff has been reduced from fourteen people to seven people. These losses include Dr. de Dios, who left NIGCC in November 2015 because it could no longer pay his salary, and a nurse practitioner, an ultrasound technician, and a genetic counselor, who cited no progression in pay as the main reason they decided to leave. NIGCC has spent about $400,000 in professional fees since October 2013.

Although NIGCC's witnesses expressed that NIGCC is in imminent danger of closing, little insight was provided as to NIGCC's current revenue, or its revenue for the last four months of 2015. NIGCC's financial condition is also affected by an FSSA audit, which determined that NIGCC has been overpaid $568,620.97 in Medicaid reimbursements. (Dr. Bader Aff. 10.) NIGCC appealed this overpayment determination and the case is still pending. The overpayment determination is not being challenged in this litigation and the parties have not addressed this

sum of money in any detail. As of the evidentiary hearing, NIGCC was still treating Medicaid patients.

## ANALYSIS

Medicaid is a cooperative federal-state program that "offers federal funding to States to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining medical care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2581 (2012). As a condition of receiving federal funds, states that elect to participate in the Medicaid program must comply with all federal requirements and standards set forth in the Medicaid Act. *See* 42 U.S.C. § 1396a(a); *see also Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003). States submit their plans and any subsequent amendments for federal approval, and this plan operates as a contract that permits the Department of Health and Human Services to withhold federal funds if a state fails to comply with the plan that was approved and adopted. *See* 42 U.S.C. § 1396c; 42 C.F.R. §§ 430.10, 430.12, 430.35; *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 969 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2736 (2013) (mem.). Provided that the federal requirements are met, "states have substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided," *Planned Parenthood of Ind.*, 699 F.3d at 969 (quoting *Alexander v. Choate*, 469 U.S. 287, 303 (1985)), "in a manner consistent with simplicity of administration and the best interest of the recipients," 42 U.S.C. § 1396a(a)(19).

The Plaintiffs are asking this Court to enjoin FSSA's (1) without cause termination of Dr. Bader from the Medicaid program; and (2) conduct regarding the prepayment review program. Specifically, the Patients allege that Dr. Bader's without cause termination violates their

statutory rights under the Medicaid Act's "freedom of choice" provision. 42 U.S.C.

§ 1396a(a)(23). The Providers allege that FSSA's prepayment review process, particularly an

inability to appeal one's status and the accompanying delays and denials of NIGCC's claims,

violates the Providers' due process rights. Separately, the Patients assert that FSSA's actions

with prepayment review deprives them of their "freedom of choice."

### A.        Abstention

As a preliminary matter, FSSA argues that *Colorado River* abstention applies and this

Court should not hear the Patients' § 1983 claim that Dr. Bader's without cause termination from

Medicaid violates their "freedom of choice" under § 1396a(a)(23). Alternatively, FSSA asks the

Court to stay this case until Dr. Bader's administrative appeal of the without cause termination is

resolved.

A federal court's ability to abstain from a case that falls within its jurisdiction "'is the

exception, not the rule,' and can be justified only in exceptional circumstances." *Adkins v. VIM

Recycling, Inc.*, 644 F.3d 483, 496 (7th Cir. 2011) (quoting *Ankenbrandt v. Richards*, 504 U.S.

689, 705 (1992)). Further, *Colorado River* abstention is permitted in considerably fewer

circumstances than the other theories of abstention. *Id.* at 498 (quoting *Colo. River Water

Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976)). Under the *Colorado River*

doctrine, a federal court may stay or dismiss a suit before it when there is a concurrent state court

case and exceptional circumstances exist that would promote "wise judicial administration."

*Colo. River*, 424 U.S. at 817–18. A district court must make a two-part inquiry to determine

whether *Colorado River* abstention should apply: (1) whether the concurrent state and federal

actions are actually parallel; and (2) if so, whether "exceptional circumstances" justify

abstention. *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th Cir. 2014).

Cases are parallel under *Colorado River* if there is "a substantial likelihood that the state

litigation will dispose of all claims presented in the federal case." *Adkins*, 644 F.3d at 499. "A

court should examine 'whether the suits involve the same parties, arise out of the same facts and

raise similar factual and legal issues,'" *id.* (quoting *Tyrer v. City of S. Beloit*, 456 F.3d 744, 752

(7th Cir. 2006)), and any doubt should be resolved in favor of exercising jurisdiction, *id.* A

cursory review reveals that no parallel action exists. The administrative appeal is not an action

pending in state court, as FSSA even acknowledges that Dr. Bader may appeal the final

administrative decision to state court once it is issued.[12] Further, Dr. Bader's state court appeal is

no longer active because it was dismissed as premature.

Even if the administrative appeal qualifies as a pending state court action, the matters are

not substantially similar. Although FSSA and Dr. Bader are parties to the administrative appeal,

the Patients are not parties. In the administrative appeal, Dr. Bader may only seek reversal of her

without cause termination on the grounds that FSSA did not comply with its own policies and

procedures in effecting the termination. For example, Dr. Bader's without cause termination may

be reversed if it is found that Dr. Bader did not receive the required sixty-day notice. The limited

scope of this appeal means that the Patients' "freedom of choice" claim will not be decided. *See*

*Planned Parenthood Gulf Coast, Inc. v. Kliebert*, — F. Supp. 3d — , No. 3:15-cv-565, 2015 WL

6551836, at *20 (M.D. La. Oct. 29, 2015) (finding *Colorado River* abstention inapplicable

because the patients were unable to initiate any state administrative proceeding to challenge their

---

[12] *Younger* abstention may apply when an ongoing state proceeding is judicial in nature, *FreeEats.com, Inc. v. Indiana*, 502 F.3d 590, 596 (7th Cir. 2007), but FSSA has only argued that *Colorado River* abstention applies.

provider's termination). The Providers' procedural due process claims against FSSA will also be absent from the state administrative appeal. Given these incongruities, Dr. Bader's state administrative appeal will not dispose of all the claims presented in this case. Therefore, *Colorado River* abstention does not warrant dismissing or staying these proceedings, and not satisfying the first part of the test excuses the Court from analyzing the lengthy list of non-exhaustive factors used to determine whether "exceptional circumstances" are present. *Freed*, 756 F.3d at 1018 (stating that the court need not address the second part if the first part is not met).

With no basis to abstain, this Court proceeds to the merits of the Plaintiffs' various claims that touch upon the complexities of the Medicaid statutes and regulations.[13]

## B.     Injunctive Relief

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Accordingly, "the moving party must demonstrate a reasonable likelihood of success on the merits, no adequate remedy at law, and irreparable harm absent the injunction." *Planned Parenthood of Ind.*, 699 F.3d at 972. Once the district court determines these threshold requirements are met, it must consider the irreparable harm the plaintiff or defendant would suffer if the injunction is denied or granted, respectively. *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012). The district court must

---

[13] Other courts have observed the onus of such a task. *Pers. Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 159 n.18 (5th Cir. 2011) ("There can be no doubt that the statutes and provisions in question, involving the financing of Medicare and Medicaid, are among the most completely impenetrable texts within human experience. Indeed, one approaches them at the level of specificity herein demanded with dread . . . ." (quoting *Rehab. Ass'n of Va., Inc. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994))).

also consider the public interest in granting or denying an injunction. *Id.* Balancing of harms is carried out by weighing each factor "against one another 'in a sliding scale analysis,'" *id.* (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)), which is a "subjective and intuitive" approach that "permits district courts to weigh the competing considerations and mold appropriate relief," *id.* (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895–96 (7th Cir. 2001)) (internal quotation marks omitted). When it is more likely that the moving party will succeed on the merits, the balance of harms may weigh less in its favor. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008).

1.      *Dr. Bader's Without Cause Termination*

The Patients argue that FSSA's without cause termination of Dr. Bader from the Indiana Medicaid program violates their statutory rights under the Medicaid Act's "freedom of choice" clause. 42 U.S.C. § 1396a(a)(23). Under § 1396a(a)(23), a state Medicaid plan must provide that "any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, *qualified to perform* the *service or services required*." *Id.* (emphasis added); *see also* 42 C.F.R. § 431.51 ("[A] beneficiary may obtain Medicaid services from any [provider] that is—(i) Qualified to furnish the services; and (ii) Willing to furnish them to that particular beneficiary."). The Patients are seeking to enforce this statutory right under § 1983. The Seventh Circuit and other federal courts have concluded that § 1396a(a)(23) creates a private right enforceable under § 1983. *E.g.*, *Planned Parenthood Ariz., Inc. v. Betlach*, 727 F.3d 960, 965–68 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1283 (2014) (mem.); *Planned Parenthood of Ind.*, 699 F.3d at 972–77; *Harris v. Olszewski*, 442 F.3d 456, 460–65 (6th Cir. 2006). FSSA does not challenge the Patients' standing to file suit. Instead,

17

FSSA argues that it has not violated the Patients' freedom of choice and that the Patients have otherwise not shown that they are entitled to a preliminary injunction.[14] The Court agrees that FSSA's without cause termination of Dr. Bader violates the Patients' freedom of choice.

---

[14] Separate from the Patients' free-choice-of-provider argument, the Court takes a moment to identify another claim related to Dr. Bader's without cause termination. The Providers raise a due process argument based on pretext, which is unrelated to their procedural due process claim for prepayment review. The latter will be decided on the merits later in this opinion. The Plaintiffs' Motion asserts that "[t]he Providers' due process rights also are being violated with respect to FSSA's purported 'without cause' termination of their provider status." (Pls.' Mot. TRO & Prelim. Inj. ¶ 35, at 16.) The Providers characterize FSSA's use of a without cause termination as a method to circumvent the notice and hearing requirements that govern for cause terminations, which they allege violates due process. This argument is also addressed briefly in the Plaintiffs' supporting memorandum, but only in reference to irreparable harm, not likelihood of success. (Mem. Supp. Pls.' Mot. TRO & Prelim. Inj. 16, 22, ECF No. 3 ("It is true that the Providers do not have any property interest in participating in the Indiana state Medicaid program. They do, however, have the right to not have their participation status terminated 'for cause' without the requisite due process protections.").) In its response to the motion, FSSA argues that the Providers' have waived this due process challenge of Dr. Bader's without cause termination because it is not mentioned in the Verified Complaint. FSSA is correct that this argument does not appear in the Verified Complaint, and although the Providers' Reply restates this pretext argument, it does not challenge FSSA's contention. (Reply 9–10, ECF No. 21.) The Plaintiffs' post-hearing filings have not reasserted the Providers' argument that Dr. Bader's without cause termination violates due process. (See Proposed Findings of Fact & Conclusions of Law 19–20, and Br. Supp. Mot. 9–14, for the Providers' arguments that prepayment review violates their procedural due process, without any reference to Dr. Bader's without cause termination violating due process.)

Given these unique circumstances, the Court notes that a party seeking a preliminary injunction may commence the action even before a complaint is filed. 11A Charles Alan Wright et al., Federal Practice and Procedure § 2929 (3d ed.) ("[A]lthough it is preferable to file the complaint first, a preliminary injunction may be granted upon a motion made before a formal complaint is presented."). Further, "counsel who seek temporary relief usually should make a motion for a preliminary injunction separate from the prayer for relief contained in the complaint." *James Luterbach Const. Co. v. Adamkus*, 781 F.2d 599, 603 n.1 (7th Cir. 1986). This suggests that strict congruity between a movant's complaint (specifically the prayer for relief) and motion for a preliminary injunction is not required. Here, the Verified Complaint does not explicitly raise a due process claim regarding Dr. Bader's without cause termination, but its prayer for relief requests a preliminary injunction against FSSA as to that point, and it is briefly discussed in the Plaintiffs' Motion and pre-hearing briefing. *Weintraub v. Hanrahan*, 435 F.2d 461, 463 (7th Cir. 1970) (looking to the prayer for relief to determine that a preliminary injunction was sought). Considering that complaints must plead facts, not law, *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998), it would be inappropriate to accept FSSA's waiver argument. Nonetheless, the Providers have failed to sufficiently argue it. *Cf. Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court. We apply that rule where a party fails to develop arguments related to a discrete issue . . . .") (internal citations omitted). The Plaintiffs' Motion, Memorandum, and Reply cite no authority to support their pretext theory and otherwise devote little attention to it; but more importantly, the Providers have not made any mention of this claim in their post-hearing filings, which included

a.      *Likelihood of Success on the Merits*

The Patients rely heavily on *Planned Parenthood of Indiana* to show that a preliminary injunction is warranted. To determine whether this case demonstrates that the Patients have a "'better than negligible' chance of success on the merits," *Girl Scouts of Manitou Council*, 549 F.3d at 1096, a detailed examination of the relevant authority is needed. Although the Patients' reliance upon cases involving abortion providers causes one to question whether the Patients' claim will ultimately succeed, the breadth of the language in *Planned Parenthood of Indiana* convinces this Court that the Patients have met the more relaxed showing required to establish a likelihood of succeeding on the merits. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) ("The threshold for this showing is low.").

In *Planned Parenthood of Indiana*, Indiana enacted a law that singled out abortion providers by prohibiting them from receiving any state contracts and grants, including state-administered federal funds. 699 F.3d at 969–70. This barred Planned Parenthood from receiving "Medicaid reimbursement and funding from state and federal grants for services unrelated to abortion." *Id.* at 971. The Centers for Medicare and Medicaid Services (CMS), a division of the Department of Health and Human Services, denied Indiana's request to amend its Medicaid plan to exclude any provider that offers abortion services. *Id.* at 969–70. Before the CMS administrative process concluded, two Indiana residents who received Medicaid services from Planned Parenthood clinics filed suit in federal court to block the defunding law. *Id.* at 968 & n.1, 971. The Seventh Circuit affirmed the district court's award of a preliminary injunction because it held that the Medicaid patients were likely to succeed on their § 1983 claim that the

proposed findings of fact and conclusions of law. In these circumstances, the Providers have waived the due process claim related to Dr. Bader's without cause termination.

defunding law violates § 1396a(a)(23). *Planned Parenthood of Ind.*, 699 F.3d at 980; *see also Planned Parenthood Ariz.*, 727 F.3d at 963 (considering an Arizona law that was "nearly identical" to Indiana's law and "echoing the Seventh Circuit's" determination that it violated § 1396a(a)(23)).

The court arrived at this conclusion because it rejected Indiana's argument that "the State's interest in avoiding indirect subsidization of abortion" provided a legitimate basis to prevent a Medicaid recipient from obtaining treatment from a provider that, absent this asserted state interest, would be qualified. *Planned Parenthood of Ind.*, 699 F.3d at 978. Despite recognizing that "[n]o one disputes that states retain considerable authority to establish licensing standards and other related practice qualifications for [Medicaid] providers," Indiana's defunding law exceeded "the *limits* of that authority." *Id.* at 980. Indiana claimed "plenary authority to exclude Medicaid providers for *any* reason, as long as it furthers a legitimate state interest." *Id.* at 978.

This attempt to "ascribe *any* meaning to the statutory term 'qualified'" was not supported by the Medicaid statutes and regulations. *Id.* at 978 (noting that states may set "reasonable standards" for a provider's qualifications (quoting 42 C.F.R. § 431.51(c)(2))). Contrary to Indiana's definition, the court held that Planned Parenthood's clinics were "qualified" under § 1396a(a)(23), meaning they were "capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." *Planned Parenthood of Ind.*, 699 F.3d at 978. The defunding law violated the free-choice-of-provider requirement because it represented an attempt to create an exclusionary rule, label it a "qualification," and use it to restrict patient choice to "a class of providers" even though the exclusionary rule was unrelated to the "provider's fitness to treat Medicaid patients." *Id.* at 978, 980; *see also id.* at 979

(observing that 42 U.S.C. § 1396a(p)(1) and its cross-referenced sections of the Medicaid Act represent a non-exhaustive list of specific mandatory or permissive grounds for states to exclude providers, including "fraud, drug crimes, and failure to disclose necessary information to regulators").

Although the patients in *Planned Parenthood of Indiana* obtained a preliminary injunction, significant factual differences exist between these cases. Chiefly, this case does not involve family planning. Dr. Bader performs testing to determine whether individuals have genetic disorders and also counsels patients to help them manage their conditions. This scope of practice is vastly different from that of Planned Parenthood. It is also far removed from the highly politicized arena that spurred Indiana to enact a law designed to defund Planned Parenthood based on the mere fact that its scope of practice included abortions. *See Planned Parenthood of Ind.*, 699 F.3d at 978. In contrast to Indiana's past conduct toward abortion providers, FSSA's medical experts testified that geneticists are important.[15] Further, FSSA's medical experts refer their patients to geneticists as needed, and Indiana Medicaid reimburses providers that perform genetic services. Because Planned Parenthood and Dr. Bader have different spheres of operations, separate "freedom of choice" concerns are implicated.

The free-choice-of-provider requirement treats family planning providers different from other types of providers. This provision has two components. Under subsection (A), "state plans must generally allow Medicaid recipients to obtain care from any provider who is 'qualified to perform the service or services required' and 'who undertakes to provide . . . such services.'"

---

[15] Dr. Leslie Hulvershorn is a faculty member at the Indiana University School of Medicine, and is board certified in general psychiatry, child and adolescent psychiatry, and addiction medicine. Dr. Ann Zerr is a faculty member at the Indiana University School of Medicine and is board certified in internal medicine. Dr. Zerr is also the Medical Director for Indiana Medicaid.

*Planned Parenthood Ariz.*, 727 F.3d at 964 (quoting § 1396a(a)(23)(A)). Under subsection (B),

"'enrollment of an individual eligible for [Medicaid] in a primary case-management system . . . , a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title,' i.e., 'family planning services.'" *Planned Parenthood Ariz.*, 727 F.3d at 964 (quoting §§ 1396a(a)(23)(B) & 1396d(a)(4)(C)). The text of the free-choice-of-provider requirement shows that Congress choose to "carve[] out and insulate[] family planning services from limits that may otherwise apply under approved state Medicaid plans . . . [to] assur[e] covered patients an unfettered choice of provider for family planning services." *Id.* (citing § 1396a(a)(23)(B)). Thus, Congress viewed family planning as the area of medical care in which a recipient's free choice of provider is "most critical." *Planned Parenthood Se., Inc. v. Bentley*, — F. Supp. 3d — , No. 2:15-cv-620, 2015 WL 6517875, at *7 (M.D. Ala. Oct. 28, 2015); *see also* Statement of Interest of the United States at 13, *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, — F. Supp. 3d — (M.D. La. Aug. 31, 2015) (No. 3:15-cv-565), 2015 WL 6551836, ECF No. 24 (quoting § 1396a(a)(23)(B) to show that "Congress singled out family planning services—such as those provided by [Planned Parenthood]—for particular protection" and concluding that Congress clearly intended no restrictions on a Medicaid beneficiary's ability to choose a family planning provider).

Without noting this distinction, the Patients rely exclusively on cases where a state targeted Planned Parenthood because of its status as an abortion provider. The Patients identify the crucial question as whether Dr. Bader is a "qualified" provider of the relevant healthcare services. After reciting that "qualified" means "to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner," (Mem. Supp. Pls.' Mot.

TRO & Prelim. Inj. 9, ECF No. 3 (quoting *Planned Parenthood of Ind.*, 699 F.3d at 978) (internal quotation marks omitted)), the Patients assert that nothing has changed in the past several months to make Dr. Bader unqualified. This characterization of events is true only if FSSA's without cause termination of Dr. Bader, the president of a non-abortion provider, unlawfully ended her Medicaid provider status.

The Patients argue that Dr. Bader's without cause termination is unlawful because Alabama used an at-will termination to preclude Planned Parenthood from Medicaid, and a district court enjoined this termination. *Planned Parenthood Se.*, — F. Supp. 3d —, 2015 WL 6517875, at *10. In *Planned Parenthood Southeast*, the governor of Alabama sent Planned Parenthood a letter notifying it that the state was exercising its ability to terminate Planned Parenthood's Medicaid contract with fifteen days written notice. *Id.* at *8. The Governor also "tweeted" his decision to terminate Planned Parenthood's provider agreement. *Id.* at *9. The Governor took this action after videos surfaced that purported to show Planned Parenthood affiliates engaging in fetal-tissue donation, and he stated that he "had no plan to terminate [Planned Parenthood's] provider agreement before viewing this video." *Id.* at *3.

In this abortion context, Alabama argued that it may "terminate Medicaid provider agreements on *any* basis recognized under state law," including "state contract law." *Id.* at *9 (emphasis added). Relying upon *Planned Parenthood Arizona* and *Planned Parenthood of Indiana*, the court rejected Alabama's contentions that the Medicaid statute gave it unbounded authority "to exclude providers for any reason whatsoever" that had no connection to "medical competency *or* legal and ethical propriety." *Id.* at *9–10 (quoting *Planned Parenthood Ariz.*, 727 F.3d at 972 and *Planned Parenthood of Ind.*, 699 F.3d at 979) (internal quotation marks omitted). The court's rationale centered around concern that Alabama's ability to cite "any reason with a

basis in state law" would "greatly weaken[]" a recipient's free-choice-of-provider rights by subjecting this right "to state policies and politics having nothing to do with the Medicaid program." *Id.* at *10 (quoting *Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868, 883 (D. Ariz. 2012) (internal quotation marks omitted) (expressing this fear when considering Arizona's law that disqualified "an entire class of providers"), *appeal dismissed as moot*, 727 F.3d at 963);[16] *see also id.* ("The state-law ground on which the Governor terminated [Planned Parenthood's] provider agreement—the at-will termination clause—falls well outside the range of grounds germane to the purposes of the Medicaid Act."); Statement of Interests of the United States at 14–15, *Planned Parenthood Gulf Coast, Inc.*, — F. Supp. 3d — (No. 3:15-cv-656), 2015 WL 6551836 ("Under Louisiana's [without cause] interpretation, a State could terminate a provider's agreement for reasons entirely unrelated to the ability of the provider to perform services or to properly bill for those services—or for no reason at all—and the federal government would be required to support that decision.").

After courts invalidated state statutes that defunded abortion providers, at least some states have resorted to a state law based "at-will" termination to target abortion providers. Permitting states to terminate abortion providers "without cause" or "at will" triggers many of the same concerns that courts cited when presented with state statutes that excluded providers from Medicaid merely because their scope of services included abortion. The fear is that states will create "a significant loophole restricting patient choice" that contradicts "the broad access to

_____

[16] Following the district court's decision granting a preliminary injunction, it awarded Planned Parenthood a permanent injunction while the appeal of the preliminary injunction was still pending before the Ninth Circuit. In the same opinion that dismissed the preliminary injunction appeal as moot, the Ninth Circuit affirmed the district court's entry of a permanent injunction in favor of Planned Parenthood.

medical care that § 1396a(a)(23) is meant to preserve." *Planned Parenthood of Ind.*, 699 F.3d at 978.

In contrast to the multitude of cases involving the class of providers that includes Planned Parenthood, the Patients do not cite to any other instance where a state statute sought to exclude a geneticist from Medicaid. Further, the Patients do not cite to any case where a non-abortion medical provider's patients challenged an at-will termination. In light of the heightened free-choice-of-provider requirement recognized for family planning services, the question becomes whether the at-will or without cause termination of a medical provider, whose scope of services does not encompass abortions, may be considered a "'permissible variation[] in the ordinary concept' of what it means to be 'qualified.'" *Id.* ("Medicaid beneficiaries 'may obtain [medical] assistance from any [provider] qualified to perform the service or services required. To be 'qualified' . . . is to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." (quoting § 1396a(a)(23)(A))). FSSA has not explained why inserting a without cause termination clause in a provider agreement permits it to lawfully render a provider unqualified, or that this type of termination falls under the state's residual authority to set provider qualifications. Without such a discussion, it is hard to discern, at least at this stage of the litigation, why the reasoning of *Planned Parenthood of Indiana* does not render a without cause termination an impermissible "loophole restricting patient choice." *Id.* at 978.

FSSA argues that because the without cause termination took effect Dr. Bader does not even reach the threshold requirement of being a "provider." Thus, FSSA concludes that this Court does not need to analyze whether Dr. Bader is qualified and the free-choice-of-provider requirement has not been violated. This reasoning is unpersuasive because it presumes that a

termination is unreviewable. *Planned Parenthood Se.*, — F. Supp. 3d —, 2015 WL 6517875, at

*7–8 (rejecting a similar argument because accepting it would permit a state to terminate a

provider's agreement on an unlawful basis and use that same unlawful basis to preclude a

patient's challenge, which would render the free-choice-of-provider provision an empty right).

Courts have defined "qualified" in the context of the free-choice-of-provider requirement and

have reviewed whether a state appropriately adjudged a provider "unqualified." *E.g.*, *Planned*

*Parenthood of Ind.*, 699 F.3d at 978–80; *Planned Parenthood Ariz.*, 727 F.3d at 969, 975

(quoting *Planned Parenthood of Ind.*, 699 F.3d at 978). This Court is equally capable of

reviewing FSSA's actions, even if a state retains some role in determining provider

qualifications. *Planned Parenthood Ariz.*, 727 F.3d at 968 & n.6 ("A court applying the free-

choice-of-provider provision in a § 1983 case does not usurp a state's authority to set medical

qualifications; instead, it defers to and applies the state's own determination of appropriate

qualifications for the services provided.").

Even if FSSA misstates how the without cause termination affects this Court's review, it

points the Court to *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170 (2d Cir. 1991), as showing a

without cause termination of a qualified provider occurring outside the abortion context. In *Kelly*

*Kare*, a qualified home health-care provider and several of its Medicaid patients sued the county

department of social services after it terminated the provider's Medicaid contract, without cause,

upon thirty days' notice.[17] *Id.* at 173. The patients unsuccessfully argued, couched in terms of

property and liberty interests, that their provider's without cause termination violated their rights

---

[17] Although the provider alleged that its employees' union status motivated the county to terminate the
contract without cause, the termination letter "simply provided no reason for the termination." *Id.* at 177.
Contrary to this, the Seventh Circuit did not acknowledge that the patients were challenging a without
cause termination, and instead characterized the provider's contract as being cancelled "based on
allegations of unfitness." *Planned Parenthood of Ind.*, 699 F.3d at 977.

under § 1396a(a)(23)(A) because it deprived them of their right to choose any qualified Medicaid provider. *Id.*

The Seventh Circuit considered *Kelly Kare* when it rejected Indiana's argument that patients could not use § 1983 to enforce § 1396a(a)(23). *Planned Parenthood of Ind.*, 699 F.3d at 977. At that point, the court discarded *Kelly Kare* by identifying it as a due process case, rather than a substantive claim that Indiana's law violated § 1396a(a)(23). *Id.* However, there was no commentary on the Second Circuit's approval of a without cause termination of a Medicaid provider agreement. This is not to say that *Kelly Kare* is dispositive, *Planned Parenthood Gulf Coast, Inc.*, — F. Supp. 3d — , 2015 WL 6551836, at *16 (admonishing the defendant for relying upon *Kelly Kare* and similar cases because they "cannot be legally relevant" when § 1396a(a)(23) provides the claim's basis and no procedural due process claim is made), but it is relevant as an acknowledgment that without cause terminations have a long-standing basis in Medicaid provider agreements.

Except for a case where Planned Parenthood is a party, the Patients fail to cite any case where the without cause or at-will termination of a Medicaid provider agreement has been held unlawful. Further, in addition to Indiana's statute that provides authority for a without cause termination, Ind. Code § 12-15-11-3,[18] a non-exhaustive search shows that several other states provide their Medicaid agencies with similar authority. Fla. Stat. § 409.907(2); La. Rev. Stat. § 437.11(C); Wash. Rev. Code § 74.09.290 (providing authority for "for convenience" terminations, Wash. Admin. Code § 182-502-0040, in addition to the lengthy list of "for cause"

---

[18] Indiana courts recently upheld the validity of FSSA's without cause termination power when a provider argued that the without cause termination violated the federal constitution. *Umbrella Family Waiver Servs., LLC v. Ind. Family & Soc. Servs. Admin.*, 7 N.E.3d 272, 275, 277–78 (Ind. Ct. App. 2014). This case only addressed the provider's due process claims, not § 1396a(a)(23).

grounds enumerated in Wash. Admin. Code § 182-502-0030); N.Y. Comp. Codes R. & Regs. tit. 18, § 504.7(a)–(b). Presumably, a state that permitted without cause terminations would include this provision in the State plan for Medicaid that the federal government approves. *See* 42 C.F.R. 430.10 (identifying the State plan as a comprehensive written statement describing its nature and scope, which includes an assurance it will be administered in accordance with federal law); 42 C.F.R. § 430.12 ("The plan must . . . be amended whenever necessary to reflect—(i) [c]hanges in Federal law, regulations, policy interpretation, or court decisions; or (ii) [m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program."); 42 C.F.R. 430.14. Based on a right that has only been enforced to prevent assaults by states on Planned Parenthood, the Patients are asking this Court to strike new ground and upend a system states apply generally to the administration of their Medicaid providers. The Court is hesitant to make that proclamation.

FSSA also raises an argument that the Planned Parenthood cases do not address, which is the significance of § 1396a(a)(23)(A)'s language that modifies "qualified"—specifically, whether *this* provider's services are "required." *Planned Parenthood Ariz.*, 727 F.3d at 969. FSSA does not argue that the Patients do not need ongoing care for their medical conditions; rather, it argues that Dr. Bader is not "capable of performing the needed medical services." *Planned Parenthood of Ind.*, 699 F.3d at 978 (defining "qualified"). To support this, FSSA's medical experts testified that they reviewed the Patients' medical records and determined the Patients do not require continued care from a geneticist and should instead receive care from a

mental health specialist. Based on her review of the medical records, Dr. Hulvershorn testified

that Dr. Bader's treatment of the Patients does not meet the standard of care.[19]

Although FSSA offers this evidence, it also reiterates that Dr. Bader's termination was

without cause and conceded during the evidentiary hearing that a "without cause [termination]

should not require any kind of outside analysis." (Hr'g Tr. vol. 2, 353:13–14); *Planned*

*Parenthood Se.*, — F. Supp. 3d — , 2015 WL 6517875, at *8 (ignoring the significant evidence

presented by the parties showing the Governor's motivation to terminate Planned Parenthood's

provider agreement because the letter did not provide a substantive reason or a statutory basis).

Further, FSSA has not pointed to a specific statute that permits a for cause termination and

argued that its evidence about Dr. Bader's substandard care provides an independent basis for its

action. *Id.* at *10–11 (stating, in dicta, that the defendant's for cause ground (i.e., substandard

patient care – 42 U.S.C. § 1320a-7(b)(6)(B)), which was belatedly raised in its response brief to

Planned Parenthood's motion for a preliminary injunction, would not have succeeded because

this Planned Parenthood office had no ties to any substandard care purportedly shown in the

fetal-tissue donation video).

---

[19] Dr. Hulvershorn treats patients diagnosed with autism, ADHD, depression, substance abuse disorders, anxiety disorders, and other behavioral and mood disorders. Dr. Hulvershorn believes that Dr. Bader offered the Patients substandard care by (1) prescribing medications not approved for children; (2) administering high doses of medication; (3) not conducting appropriate drug monitoring; (4) simultaneously changing multiple medications; and (5) not utilizing other beneficial medicines and services. Dr. Hulvershorn also treats two brothers who were previously Dr. Bader's patients. She testified that Dr. Bader did not meet the standard of care because, given her initial review of the brothers, Dr. Bader overmedicated them and did not control their behavioral problems. The overmedicating by Dr. Bader included giving the brothers high doses of blood pressure medication that were unheard of even in adults. Dr. Hulvershorn also recounted discussions with a psychiatry colleague after the emergency room at Riley Hospital in Indianapolis treated several of Dr. Bader's patients who presented on "very high doses of medication." (Hr'g Tr. vol. 2, 357:2.) Dr. Hulvershorn and another physician hoped to find someone to reach out to Dr. Bader in a "collegial way," but there is no evidence that contact was made. (Hr'g Tr. vol. 2, 351:7.) In rebuttal, Dr. Bader testified that she has never been called before the licensure board, any hospital board, or any other authority. She testified she has never received a complaint, including from any other physicians, about her quality of care.

The various Planned Parenthood cases did not address a scenario where it was alleged that the specific provider in question failed to act in a "professionally competent, safe, legal, and ethical manner." *Planned Parenthood of Ind.*, 699 F.3d at 978; *see, e.g.*, *Planned Parenthood Ariz.*, 727 F.3d at 974–75; *Planned Parenthood Se.*, — F. Supp. 3d — , 2015 WL 6517875, at *3, *11 (noting that no allegations of wrongdoing existed, except for the unrelated fetal-tissue donation video). If FSSA has legitimate for cause grounds based on Dr. Bader's standard of care, or even billing history, it has not been adequately articulated in the context of Dr. Bader's without cause termination. Regardless, Indiana's residual authority "to establish licensing standards and other related practice qualifications for providers" provides an alternative mechanism to address such problems, which should not be conflated with a termination that has been designated to be without cause. *Id.* at 980.

FSSA has not attempted to fit a without cause termination within the Medicaid statutes or regulations, likely because the Seventh Circuit rejected many of FSSA's potential arguments when considering the defunding statute. For example, states have pointed to § 1396a(p)(1) to justify broad power to terminate a provider, as that provision states,

> In addition to any other authority, a State may exclude any individual entity for purposes of participating under the State plan . . . for any reason for which the Secretary could exclude the individual or entity . . . under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title.

However, this standard savings clause "signals a non-exclusive list of specific grounds upon which states may bar providers from . . . Medicaid. It does not imply that states have an unlimited authority to exclude providers for any reason whatsoever." *Planned Parenthood of Ind.*, 699 F.3d at 979; *Planned Parenthood Ariz.*, 727 F.3d at 971–72 ("This sequence indicates that the Medicaid Act itself must provide that 'other' authority, just as it supplies the 'authority' covered by the rest of the subsection."). Instead, FSSA relies upon paragraph 39(b) of the

Indiana Health Coverage Program Provider Agreement and asserts that the without cause termination should be upheld as a matter of policy.

Even though the Patients do not show the free-choice-of-provider requirement being violated outside the abortion context, accepting FSSA's position would lead to the same problems when interpreting the statute. "Nowhere in the Medicaid Act has Congress given a special definition to 'qualified,' much less indicated that each state is free to define this term for purposes of its own Medicaid program however it sees fit." *Planned Parenthood Ariz.*, 727 F.3d at 970. FSSA's use of without cause terminations is another manifestation of Indiana's claimed authority to "establish provider-eligibility criteria based on any legitimate state interest." *Planned Parenthood of Ind.*, 699 F.3d at 978. FSSA's characterization of Dr. Bader's termination as "simply the State making a business decision . . . that we no longer wanted to contract with Dr. Bader," illustrates that the termination was wholly unrelated to her qualifications. (Gartenman Dep. 33:25–34:1–4.) It does not help that FSSA uses without cause terminations sparingly. (Gartenman Dep. 24:11–19 (estimating that over a year and a half FSSA carried out over thirty for cause terminations and about three to five without cause terminations).) By definition, a legal relationship being "at will" permits a person to act "as one wishes or chooses . . . without cause." Black's Law Dictionary 125 (7th ed. 1999). FSSA's ability to cite unspecified business interests to render a Medicaid provider unqualified "would open a significant loophole for restricting patient choice, contradicting the broad access to medical care that § 1396a(a)(23 is meant to preserve." *Planned Parenthood of Ind.*, 699 F.3d at 978

The general need for FSSA to resort to without cause terminations is also unclear given the methods available to FSSA under the Medicaid Act that would not implicate the free-choice-

of-provider requirement. Most obvious, and upon which FSSA often resorts, are the Medicaid Act's various mandatory and permissive for cause grounds to exclude or terminate individual providers. § 1396a(p)(1); § 1320a-7; § 1395cc(b)(2). Further, states may apply for waivers to limit a recipient's choice in certain situations. *See, e.g.*, 42 U.S.C. § 1315 (demonstration projects); § 1396n(b) (efficiency). FSSA has not argued that any exceptions apply to Dr. Bader's without cause termination. Being bound by our "duty to give effect, if possible, to every clause and word of a statute," *United States v. Menasche*, 348 U.S. 528, 538–39 (1955), FSSA's argument would impermissibly infringe upon a Medicaid recipient's freedom of choice.

Because FSSA's without cause termination of Dr. Bader excludes her from being a Medicaid provider for no reason at all, which has no bearing on her qualifications to treat patients, the Patients have more than a negligible chance of succeeding on the merits.


b.      *No Adequate Remedy at Law, Irreparable Harm, and Balancing of Harms*

When a party is seeking temporary relief, it must prove that absent such relief, "it will suffer irreparable harm in the interim period prior to final resolution of its claims," and "that traditional legal remedies would be inadequate." *Girl Scouts of Manitou Council*, 549 F.3d at 1086; *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 383 (7th Cir. 1984) (noting the overlap between "no adequate remedy at law" and "irreparable harm" in the preliminary injunction setting); *see also id.* at 386 ("[I]rreparable harm . . . is[] harm that cannot be prevented or fully rectified by the final judgment after trial."); *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 390 (7th Cir. 1985) ("[A]n adequate remedy at law . . . is[] whether interim harm caused by the activity to be enjoined can be completely offset by a subsequent award of damages or other legal relief.").

The Patients argue that any violation of their statutory "freedom of choice" constitutes *per se* irreparable harm because a Medicaid patient's inability to see his provider of choice (in this case Dr. Bader), even for a short period, is an injury that cannot be rectified. Further, the Patients predict that their health may deteriorate if they cannot see Dr. Bader during the pendency of this litigation, as the distance to other Medicaid-participating physician-geneticists may spur these patients to forego treatment. In response, FSSA argues that *per se* irreparable harm is limited to constitutional violations. With only a statutory right implicated, FSSA contends that irreparable harm should not be found any time four patients subjectively believe that they need care from a physician-geneticist, and especially where FSSA's medical experts disagree with Dr. Bader that the Patients should be treated by a geneticist rather than a mental health specialist.

Courts have shown heighted concern when a plaintiff alleges a constitutional violation. *See Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978) ("[O]nce a constitutional violation is demonstrated, 'the scope of a district court's equitable powers to remedy past wrongs is broad . . . .'" (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971))); *see also Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) (Williams, J., dissenting) ("[W]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (collecting cases). The Patients do not allege a constitutional violation, and unless directed otherwise, broadly treating any statutory violation as *per se* irreparable harm would be inconsistent with a district court's discretion to grant injunctive relief. *Cf. Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 843 (7th Cir. 2005) ("[U]nless a statute clearly mandates injunctive relief for a particular set of circumstances, the courts are to employ

traditional equitable considerations (including irreparable harm) in deciding whether to grant such relief.").

The Patients rely on *Planned Parenthood of Indiana* to show that any violation of the free-choice-of-provider requirement is *per se* irreparable harm. The Court does not draw this conclusion from that case. Rather than interpreting any violation of § 1396a(a)(23) as *per se* irreparable harm, the court acknowledged the district court's holding that "the loss of Medicaid funding" would cause Planned Parenthood irreparable harm because it would have to "lay off dozens of workers, close multiple clinics, and stop serving a significant number of its patients" and "[Planned Parenthood's] Medicaid patients would lose their provider of choice." *Planned Parenthood of Ind.*, 699 F.3d at 980–81. Noting these situational factors, and only attributing them "significant weight given Planned Parenthood's strong likelihood of success on the merits," suggests that the court did not adopt a *per se* rule that controls whenever a Medicaid recipient's freedom of choice right is implicated. *Id.*

Applying these considerations here also reveals some distinctions from the harm suffered in *Planned Parenthood of Indiana*. First, NIGCC has not lost its Medicaid funding and it is still able to treat patients, albeit with its traditional fee-for-service claims subject to prepayment review.[20] NIGCC's witnesses testified about its financial difficulties and that its staff has been reduced from fourteen people to seven people since 2013. Although the Plaintiffs assert that Dr. Bader's without cause termination has harmed NIGCC's operations, and this Court may infer that Dr. Bader generated a significant share of NIGCC's Medicaid claims, virtually all the evidence related to NIGCC's operations was directed to challenging prepayment review.

---

[20] NIGCC's claims submitted to MCEs were also subject to prepayment review, but it is not clear whether those entities have lifted NIGCC's prepayment review status. The Patients' assertion that FSSA's use of prepayment review violates their "freedom of choice" is addressed later in this opinion.

Therefore, unlike *Planned Parenthood of Indiana*, where the organization's termination as a Medicaid provider would result in across-the-board loss of Medicaid revenue, a lesser limit was imposed that still allows NIGCC to participate in Medicaid.

Second, *Planned Parenthood of Indiana* did not address the termination of a single doctor in an organization. Granted, the free-choice-of-provider requirement applies to "any institution . . . or person," § 1396a(a)(23)(A), but this does not mean that scale should be ignored for purposes of determining irreparable harm. In *Planned Parenthood of Indiana*, the Medicaid termination meant that none of Planned Parenthood's medical professionals, who collectively treated 9300 Medicaid recipients at its 28 health clinics in Indiana, could treat patients in affiliation with Planned Parenthood. *Planned Parenthood of Ind.*, 699 F.3d at 970–71. Similarly, NIGCC has treated about 7000 Medicaid patients per year at its office and its two clinics, which were both open a few days per year before they closed.[21] However, NIGCC's nurse practitioner is still able to treat Medicaid patients at NIGCC's office, which occurs with Dr. Bader's supervision. This may not be an ideal situation, but it is not identical to Indiana terminating NIGCC's provider agreement, which is what happened with Planned Parenthood.

The Patients also argue that not being able to have appointments with Dr. Bader may cause them distress and their conditions may deteriorate. This harm warrants consideration. *Planned Parenthood of Ind. v. Comm'r of the Ind. State Dep't of Health*, 794 F. Supp. 2d 892, 912 (S.D. Ind. 2011) (concluding that the two patients' inability to receive certain medical services from their chosen Medicaid provider supported finding irreparable harm), *aff'd in part, rev'd in part on other grounds*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2736

---

[21] The Providers operated a clinic in Muncie and South Bend through a grant from the Indiana State Department of Health. The Providers would go to Muncie once a month and to South Bend five times a year. On these days, NIGCC's office in Fort Wayne would not see patients.

(2013) (mem.). But as already stated, the Patients continue to have access to the nurse practitioner employed and supervised by Dr. Bader at NIGCC. These Patients are not completely cut off from their chosen provider, which was the situation in *Planned Parenthood of Indiana* because Planned Parenthood ceased its Medicaid services. *Id.* at 913. Besides arguing that the Patients' medical conditions do not require continuing care from a physician-geneticist, FSSA does not challenge the genuineness of the Patients' desire to see Dr. Bader.

Therefore, even ignoring the fact that these Patients are not being denied access to a provider of family planning services, the Patients' scenario is not entirely identical to that of the patients in *Planned Parenthood of Indiana*. This makes it less clear-cut that the Patients' harm is irreparable. Although mindful that a *per se* rule has not been announced for § 1396a(a)(23), the Patients' inability to see Dr. Bader during this litigation, or any doctor affiliated with her practice, makes the Patients' harm arguably irreparable. Thus, the Patients also meet this threshold requirement.

Having found that the Patients' claim shows a likelihood of success on the merits and that they face irreparable harm, this Court will balance the harms to minimize the cost of potential error. *Girl Scouts of Manitou Council*, 549 F.3d at 1086. This requires using a sliding scale approach to weigh the irreparable harm the parties would respectively endure due to the court's ruling. *Id.* "[T]he less likely [the plaintiff] is to win, the more need [the balance of harms] weigh in his favor." *Id.* The court should also consider any effects that a preliminary injunction would have on nonparties, which is termed the public interest. *Id.*

FSSA has not argued that it will suffer irreparable harm if an injunction is issued as to Dr. Bader's without cause termination. In addition to the Patients' points cited above to show irreparable harm, they also list a number of public interest considerations. The Patients highlight

that Dr. Bader's without cause termination leaves Fort Wayne without a physician-geneticist. FSSA appears to concede that this point is regrettable. To lessen the significance of this, FSSA stated that "Medicaid offers transportation services for necessary medical care, which would cover both the Patient-Plaintiffs and the Fort Wayne Medicaid population." (Defs.' Closing Arg. Br. 16, ECF No. 42.) These alternative transportation options may be relevant for members of the public who do not have a particular interest in seeing Dr. Bader, but this argument has otherwise been rejected. *Planned Parenthood of Ind.*, 699 F.3d at 981 ("Indiana maintains that any harm to Planned Parenthood's Medicaid patients is superficial because they have many other qualified Medicaid providers to choose from in every part of the state. This argument misses the mark. That a range of qualified providers remains available is beside the point. Section 1396a(a)(23) gives Medicaid patients the right to receive medical assistance from the provider of their choice without state interference, save on matters of provider qualifications.").

Although this tips the balance in the Patients' favor, *Planned Parenthood of Indiana* involved a significant fact that is not present in this case. In response to Indiana's bill that removed Planned Parenthood from Medicaid because its scope of services included abortions, the federal government threatened the partial or total withholding of federal Medicaid dollars to the state of Indiana, which exceeded $5 billion. *Id.* This had the potential to deprive one million Indiana citizens of their Medicaid coverage. *Id.* In contrast, Dr. Bader's without cause termination has not threatened the existence of the entire Indiana Medicaid program. The Patients assert that Dr. Bader's without cause termination will result in longer wait times across the state for individuals seeking genetic services, but the Court does not understand how this public interest matches the magnitude of what was at stake in *Planned Parenthood of Indiana*.

Considering that FSSA failed to point to any factor that would weigh in its favor, balancing the harms would favor the Patients.

Because the Patients have also shown a likelihood of success on the merits and irreparable harm, a preliminary injunction on their behalf is warranted. FSSA must rescind its without cause termination of Dr. Bader and reinstate her Medicaid provider agreement until this Court reaches a final decision.

**2.      *Injunctive Relief Related to Prepayment Review***

The Plaintiffs also seek to enjoin FSSA's actions related to prepayment review. On October 28, 2013, NIGCC was notified that it was placed on a payment suspension and that its Medicaid claims would be subject to prepayment review. NIGCC's payment suspension was lifted on November 10, 2014, which meant that Indiana Medicaid could now disburse money to pay NIGCC's claims; however, NIGCC remained on prepayment review. Presently, NIGCC is still in the prepayment review program for traditional fee-for-service Medicaid, which is administered by FSSA.

During this litigation, the Plaintiffs' arguments regarding prepayment review have evolved and it is important to identify the relief the Plaintiffs seek. The Providers and the Patients each challenge NIGCC's prepayment review status. Initially, the Providers requested prospective injunctive relief to enjoin FSSA from "*continuing* to block *all payments* owed to the Providers for claims submitted over a two-year period through the placement of the Providers in the so-called 'Medicaid Prepayment Review Program.'" (Pls.' Mot. TRO & Prelim. Inj. 18 (emphasis added).) Based on this alleged conduct, the Providers contended that FSSA violated their federal and state due process rights because FSSA illegally "withh[e]ld payments

indefinitely without a hearing" and "FSSA will not provide the Providers with a hearing to challenge" the allegations of fraud or noncompliance. (Mem. Supp. Pls.' Mot. TRO & Prelim. Inj. 12–13.)

After the five-day evidentiary hearing, the Providers allege that, "as applied" to them, (Br. Supp. Mot. 14, ECF No. 39), FSSA's prepayment review process violates their due process rights. The Providers have softened their argument that FSSA has withheld all payments owed to them, presumably because both parties' evidence revealed that such a statement is factually inaccurate, and now clarify that FSSA has used prepayment review to preclude the Providers from "hav[ing] an opportunity to respond and be heard" on the claims denied by the prepayment review team. (Br. Supp. Mot. 10.) To support their argument that FSSA has not allowed them any fair opportunity to be heard on the disputed issues, the Providers now cite various deficiencies in the operations of FSSA's prepayment review program, which the Providers believe create onerous and arbitrary conditions that prevent the Providers from being heard.[22]

---

[22] In addition to this, the Providers raise a different due process argument in their Memorandum of Law in Support of the Preliminary Injunction that is not mentioned in the Verified Complaint, the Motion for Preliminary Injunction, or the post-hearing filings. After acknowledging that 42 U.S.C. § 1396a(a)(37)(B) requires states to create a regulatory process for prepayment review, the Providers state that "[w]hile [we] do not necessarily contend that Indiana has no authority in which to yield prepayment review generally— at least at this stage of the litigation, though they reserve the right to raise that argument in subsequent proceedings—in the case *sub judice*, FSSA has failed to follow proper procedure, rule or law in subjecting the Providers to the agency's purported prepayment review process." (Mem. Supp. Pls.' Mot. TRO & Prelim. Inj. 14.) The Providers fault Indiana's regulatory authority for not "defining the parameters, limitations, and procedures for prepayment review," and simultaneously, for violating its own policies and procedures. (*Id.* 14–15.) The section concludes as follows: "During the entire two-year prepayment review, FSSA provided no parameters for prepayment review and no additional information to help the Provider understand the scope of benefits by correlating billing practices and IHCP policy. In fact, the opposite is true. The Providers have been left completely in the dark as to why they were continued on prepayment review and/or how to remedy potential problems to get off that status. The Providers even reached out to FSSA more than forty or fifty times asking FSSA why they were still on the Medicaid Prepayment Review Program. The only feedback that they were provided was the purported error rate in excess of 99 percent—but without any explanation as to the basis for this purported rate. Therefore, FSSA's failure to abide by its own guidance concerning its Medicaid Prepayment Review Program violated the Providers' due process rights for this reason as well." (*Id.* 15.) Putting aside that the

Separately, the Patients argue that FSSA's prepayment review program violates their statutory rights under § 1396a(a)(23). The Patients assert that FSSA has applied prepayment review in a manner that deprives NIGCC of "substantially all of its Medicaid revenue," and because NIGCC depends mainly on Medicaid revenue, it results in the Patients being deprived of their "freedom of choice." (Pls.' Proposed Findings of Fact & Conclusions of Law 19, ECF No. 40.)

a.     *Providers' Due Process Claims*[23]

The Providers' request for injunctive relief against FSSA's actions related to prepayment review is brought through § 1983 under the principle set forth in *Ex parte Young*, 209 U.S. 123 (1908). (Mem. Supp. Pls.' Mot. TRO & Prelim. Inj. 2 n.1.) Although the parties understand that *Ex parte Young* only permits a state official to be sued in his official capacity for prospective injunctive relief, the nature of the evidence presented over the five-day evidentiary hearing and how the Providers' framed their arguments requires a brief note on the scope of the issues before this Court.

---

Providers received remittance advice on a weekly basis stating why each claim was denied, and that the Plaintiffs' post-hearing filings criticize the parameters and procedures that are in place, the legal basis for this due process argument is not clearly articulated. The Providers have not identified any underlying property right specific to this claim, nor have they cited to any authority where a Medicaid provider sues to enforce this right. Due to the limited development of this claim, and the Providers' failure to articulate it further in subsequent briefing, the Courts finds that this argument is waived for purposes of a preliminary injunction.

[23] The Plaintiffs' Verified Complaint for Declaratory Judgment and Injunctive Relief presents the Providers' due process claim; however, the header for this count reads "Fourteenth Amendment Equal Protection." (V. Compl. 15, ECF No. 1 (emphasis omitted).) Further, the second paragraph of this count states that "FSSA's actions violated the Providers' rights by singling them out for unfavorable treatment without adequate justification." (*Id.* ¶ 64, at 15.) The remainder this count's paragraphs exclusively discuss due process and nowhere else in the Plaintiffs' filings is an equal protection claim presented. Therefore, the Court understands the Plaintiffs' references to "equal protection" to be typographical errors and this legal theory will not be addressed.

First, this Court may not award retroactive monetary relief because such relief is outside the scope of *Ex parte Young* and FSSA's Amended Answer raises the Eleventh Amendment as an affirmative defense.[24] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984). This limitation would not prevent the Court from entering an injunction that may require FSSA to pay future claims on certain grounds. *Edelman v. Jordan*, 415 U.S. 651, 667–68 (1974) (stating that the likely need to spend money from the state treasury to comply with a court's mandate has an "ancillary effect on the state treasury" and is "a permissible and often an inevitable consequence" of *Ex parte Young*). That is because any future payments would stem from a court order telling FSSA to stop violating federal law. *See Wisc. Hosp. Ass'n v. Reivitz*, 820 F.2d 863, 867 (7th Cir. 1987) ("*Ex parte Young* envisages a situation in which state officials are being told in effect to leave the plaintiff alone. . . . [I]f the officials retain the money claimed by the plaintiff and deposit it in the state treasury . . . a suit asking the officials not to interfere with the plaintiff is of no use to him.").

The Providers are asking this Court to enjoin FSSA from denying them an opportunity to be heard at a meaningful time and in a meaningful manner on their Medicaid claims that are denied by FSSA in prepayment review. (Br. Supp. Mot. 10.) The extensive amount of evidence presented at the five-day evidentiary hearing addressing past Medicaid claims for services to patients, at least to the extent it relates to the Providers' due process claim, was relevant to show: (1) why the Providers believe that they have a property right in the claims, which establishes the foundation for their procedural due process claim against FSSA; and (2) that they disagree with

_____

[24] In October 1976, Congress repealed a provision requiring states participating in Medicaid to waive their Eleventh Amendment immunity, which was made retroactive to January 1, 1976. *Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 154 n.3 (1981) (per curiam) (citing Act of Oct. 18, 1976, Pub. L. No. 94-552, 90 Stat. 2540).

the decisions of the FSSA prepayment review analysts. Therefore, the Providers are asking this Court to provide them with an opportunity to be heard.[25]

Second, the Providers' briefing makes a single reference to state and federal due process violations, without further elaboration elsewhere. This passing mention of state due process violations creates some ambiguity, but the Court would only observe that it lacks authority to award any type of relief founded upon allegations that FSSA's actions violated only state law. *Pennhurst*, 465 U.S. at 105, 121; *Lett v. Magnant*, 965 F.2d 251, 255–56 (7th Cir. 1992). Therefore, the Court only considers FSSA's actions to the extent that its conduct would constitute a violation of federal law.

As explained below, the Providers' procedural due process claim is unlikely to succeed because prepayment review is not being used as a *de facto* suspension and they are not excused from using the postdeprivation remedies available under state law. In addition, the Providers have failed to prove that they will suffer irreparable harm absent a preliminary injunction.

_____

[25] The scope of the injunctive relief sought by the Plaintiffs has not been consistent throughout this litigation. The Plaintiffs did not ask to be removed from the prepayment review program until they filed their closing argument brief. (Br. Supp. Mot. 20.) However, their contemporaneous filing only sought to enjoin FSSA's "lack of notice and hearing." (Pls.' Proposed Findings of Fact & Conclusions of Law ¶ 15, at 21 ("Despite the foregoing delays, lack of payment, arbitrary and unpublished claim review criteria, and burdensome submission process, FSSA does not provide any opportunity for a provider placed into the Prepayment Review Program to appeal or otherwise be heard on that status. This lack of notice and hearing is inconsistent with the fundamental notion of due process.").) This is not the same as asking to be removed from prepayment review. The Providers' request for notice and a hearing was evident in its Motion and accompanying Memorandum of Law, where the Plaintiffs asked this Court to "**ENJOIN** Defendants and FSSA from . . . (b) continuing to block all payments owed to the Providers for claims submitted over a two-year period through the placement of the Providers in the so-called 'Medicaid Prepayment Review Program.'" (Pls.' Mot. TRO & Prelim. Inj. 18; *see also* Mem. Supp. Pls.' Mot. TRO & Prelim. Inj. 25.) Any ambiguity regarding the scope of injunctive relief must also be read in light of the Plaintiffs' repeated assertions that no hearing is available, that all claims are denied, and that FSSA must stop using prepayment review in an illegitimate way. Removing the Providers from prepayment review may be a logical result if there were in fact no postdeprivation remedies and it was used as a suspension; however, as will be discussed, that is not this scenario.

i. *Likelihood of Success on the Merits*

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). A two-step analysis is required for a procedural due process claim. *Doherty v. City of Chi.*, 75 F.3d 318, 322 (7th Cir. 1996). A court must determine (1) "whether the plaintiff has been deprived of a protected interest"; and (2) if so, "what process is due." *Id.*

"Property, for purposes of the due process clause of the fourteenth amendment, is 'a legitimate claim of entitlement.'" *Easter House v. Felder*, 910 F.2d 1387, 1395 (7th Cir. 1990) (en banc) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "A claim of entitlement is 'defined by existing rules or understandings that stem from an independent source such as state law.'" *Id.* Although the Providers concede that they have no property interest in remaining part of the state Medicaid program, they assert "a right to due process regarding any submitted claims that are denied by FSSA," and "[a]t a minimum, this requires notice and an opportunity to be heard." (Pls.' Mot. TRO & Prelim. Inj. 15.) This appears to be a valid distinction between property rights. *Compare Grason v. State of Ill. Inspector Gen.*, 559 Fed App'x 573, 574 (7th Cir. 2014) ("[I]t is doubtful that current Medicaid providers even have a protected interest in continuing in the program." (citing *Guzman v. Shewry*, 552 F.3d 941, 953 (9th Cir. 2009)); *see also Senape v. Constantino*, 936 F.2d 687, 690–91 (2d Cir. 1991), *with Pers. Care Prods., Inc. v. Hawkins*, 635 F.3d 155, 159 & n.20 (5th Cir. 2011) (holding that when a state agency is investigating a provider's *past payments* for fraud, neither federal or Texas law gives a provider a property right in reimbursements withheld on claims *not within* the investigation's scope, but

acknowledging that the agency may only refuse to pay "for cause" and claims may not be withheld indefinitely. (quoting *Yorktown Med. Lab., Inc. v. Perales*, 948 F.2d 84, 89 (2d Cir. 1991))); *Tekkno Labs., Inc. v. Perales*, 933 F.2d 1093, 1098–99 (2d Cir. 1991).

The Indiana cases cited by the Providers generally recognize that a provider's submitted claims may not be denied without due process. *Magnant v. Ambulatory Renal Servs., Inc.*, 575 N.E.2d 1029, 1032 (Ind. Ct. App. 1991) (citing *Ind. State Dep't of Welfare, Medicaid Div. v. Stagner*, 410 N.E.2d 1348, 1350 (Ind. Ct. App. 1980)). Based on this property interest, the Providers take issue with FSSA's prepayment review program, which they characterize as an "unauthorized and unappealable [method] to deny payments of all claims submitted."[26] (Mem. Supp. Mot. TRO & Prelim. Inj. 13.) The Providers claim that prepayment review violates their procedural due process under 42 C.F.R. § 455.23(a) because they perceive prepayment review as equivalent to a payment suspension, but without an appellate remedy to challenge one's placement into prepayment review. However, § 455.23(a) and its appellate remedy apply only to a payment suspension. Therefore, the Providers accuse FSSA of using prepayment review as a *de facto* payment suspension to invoke § 455.23(a), and the Providers' procedural due process claim hinges upon a unitary perception of a payment suspension and prepayment review.

Based on this characterization of prepayment review, the Providers devote much attention to *Maynard v. Bonta*, No. CV 02-06539, 2003 U.S. Dist. LEXIS 16201 (C.D. Cal. Aug. 29, 2003), where a provider sued the state Medicaid officials under § 1983 for *damages* after the state instituted a payment suspension pursuant to 42 C.F.R. § 455.23(a), which stopped all Medicaid payments during the fraud investigation. *Id.* at *9, *14–16, *52. In denying the

---

[26] The Providers are not challenging their payment suspension that was implemented on October 28, 2013, and dissolved on November 10, 2014.

defendant's Rule 12(b)(6) motion as to the provider's due process claim, the court considered that the defendants withheld all funds for a two-year period as the fraud investigation continued—rendering its action "indefinite" rather than "temporary" as contemplated by the regulation—and the provider lacked an appeal mechanism. *Id.* at *14–16, *59–61. Despite recognizing the general rule that a provider has no property interest in Medicaid funds withheld pending an investigation for fraud or illegality, the court found this provider had a "limited property interest in the withheld funds," defined as "an interest in having the payments withheld only 'temporarily' while the state conducted a reasonably prompt fraud investigation." *Id.* at *57, *59–61, *65.

The Providers' portrayal of FSSA's prepayment review program as equivalent to the *Bonta* payment suspension rests upon the assumption that FSSA has been withholding all funds from NIGCC during prepayment review. Contrary to this, evidence presented by both parties during the five-day evidentiary hearing showed that FSSA has paid a number of NIGCC's claims over the past several months. Specifically, in the last four months of 2015, FSSA approved 67 percent of the Providers' claims, which resulted in payments of $25,341.03. FSSA denied the other claims based on specific reasons after being individually reviewed. Although FSSA denied all of the Providers' claims that it reviewed before June 2015, these denials were also made for specific reasons after being individually reviewed. This is vastly different from *Bonta*, where the provider had no prospect of being paid because a payment suspension was in place for two years. The Providers were on a payment suspension from October 28, 2013, until November 10, 2014, while FSSA was investigating allegations of fraud, but after that period the Providers' claims were eligible for payment, provided that they submitted accurate claims.

When the Providers' suspension was instituted, they were also afforded the appeal required by 42 C.F.R. § 455.23(a).[27] This is the appeal that was unavailable to the provider in *Bonta*. Unlike the appeal right provided for a payment suspension, § 455.23(a), FSSA contends that prepayment review is a "State monitoring remedy" that is "not subject to appeal." § 431.531(b)(2). FSSA has raised this argument multiple times in its briefing, and the Providers have not responded to it. This is not meant to imply that FSSA could never operate its prepayment review program in a manner that constituted a payment suspension, but in this instance, where FSSA has been reviewing the Providers' claims each month and approving those claims that meet the criteria, the Providers' allegations that they have not been afforded any due process and that prepayment review is a payment suspension are not likely to succeed.

After the five-day evidentiary hearing, the Providers still periodically refer to FSSA's prepayment review program as equivalent to a suspension. However, the Providers' arguments have become less focused by raising several new reasons that their procedural due process rights have been violated. Principally, the Providers allege that, "as applied" to them, (Br. Supp. Mot. 14), FSSA's prepayment review process violates their due process rights by: (1) taking too long to review claims; (2) denying claims based on unpublished criteria; (3) requiring paper submissions to be mailed to the reviewers, which overly burdens the Providers; and (4) "not provid[ing] *any* opportunity for a provider placed into the Prepayment Review Program to appeal or otherwise be heard."[28] (Pls.' Proposed Findings of Fact & Conclusions of Law 20–21.) In

---

[27] On November 8, 2013, FSSA received the Providers' appeal of the payment suspension.

[28] To the extent that the Providers' argue that they are entitled to a hearing on FSSA's decision to place them into prepayment review, this has already been addressed and dismissed. The Providers have not identified any property right in not being placed in prepayment review, nor have they argued why prepayment review is not a "State monitoring remedy" implemented under 42 C.F.R. § 431.531(b)(2) that is "not subject to appeal."

sum, these alleged "as applied" deficiencies are cited as components of FSSA's collective effort to preclude the Providers from "hav[ing] an opportunity to respond and be heard" on the claims denied by the prepayment review team. (Br. Supp. Mot. 10.)[29] Thus, the Providers argue that FSSA's prepayment review program violates their "guarantee of fair procedure" under the Due Process Clause. *Zinermon*, 494 U.S. at 125.

Because due process is a "flexible concept that varies with the particular situation," *Hamlin v. Vaudenberg*, 95 F.3d 580, 584 (7th Cir. 1996) (quoting *Doherty*, 75 F.3d at 323), what constitutes an opportunity to be heard "at a meaningful time and in a meaningful manner" is tailored to the context. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "'Post-deprivation remedies are a constitutionally acceptable substitute for predeprivation remedies in many procedural due process cases.'" *Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 939–40 (7th Cir. 2003) (quoting *Wudtke v. Davel*, 128 F.3d 1057, 1063 (7th Cir. 1997)). However, when a state provides no predeprivation remedy, the court must ask whether the postdeprivation remedies offered are an adequate substitute. *Id.* at 940; *Doherty*, 75 F.3d at 323 ("In certain circumstances, postdeprivation remedies . . . as a practical matter . . . are the only remedies that the state can be expected to provide."). If it is, the court must then determine whether the specific postdeprivation remedies were sufficient in this case. *Veterans Legal Def. Fund*, 330 F.3d at 940.

By asserting that FSSA has not provided them with an opportunity to respond and be heard on the claims denied by FSSA's prepayment review team, the Providers are contending that FSSA does not provide a predeprivation or postdeprivation remedy for each Medicaid claim

---

[29] At their core, these points are consistent with the Plaintiffs' statements in its Motion, where they claimed, "[t]o this day, the Providers have never been given the opportunity to be heard on why FSSA should not be permitted to continue to withhold claim payments otherwise owed to them." (Pls.' Mot. TRO & Prelim. Inj. 15; *see also* Mem. Supp. Pls.' Mot. TRO & Prelim. Inj. 12 ("FSSA cannot legally withhold payments indefinitely without a hearing.").)

that was denied. But even if the Providers dispute the competence of FSSA to approve or deny a claim, the Providers' argument accepts that FSSA performs an individualized review of each submitted claim. *Magnant*, 575 N.E.2d at 1032 ("[R]eimbursement to Medicaid providers is not automatic, and each submitted claim must be reviewed by the Department to determine whether the services for which reimbursement is requested were medically reasonable and necessary.").

The Providers start the claim review process by submitting a Medicaid claim to FSSA for payment, which occurs daily and can total several hundred claims per month. The amount of money requested for a claim varies based on the medical care performed. An analyst employed by FSSA reviews the claim for completeness and accuracy. The FSSA prepayment review team has one manager who supervises four analysts. Two analysts are assigned to the Providers' claims, and the manager does not review Medicaid claims. If a claim satisfies the stated criteria, then the analyst approves the claim and FSSA pays it. The analysts review claims for compliance "with all rules/guidelines set forth in the IHCP Provider Manual, all bulletins, banners, and newsletters issued by FSSA, the Indiana Administrative Code (IAC), and any other applicable rules and regulations." (Pls.' Hr'g Ex. 2, at 3.) An FSSA analyst assigned to the Providers' claims testified that this includes the Indiana Medical Policy, the Current Procedural Terminology (CPT) book, and guidelines from the American Medical Association and coder's associations.

As noted above, the Providers' criticisms of the prepayment review program relate to this submission and approval procedure, but they present no argument on the need for a predeprivation remedy. The Providers' failure to press for a predeprivation remedy between the time the Providers submit a claim and when the FSSA analyst denies a claim confirms this Court's belief that such a remedy would be impracticable. *Penn. Cent. Corp. v. U.S. R.R. Vest*

*Corp.*, 955 F.2d 1158, 1161 (7th Cir. 1992) (stating various reasons why a predeprivation hearing may not be required). Given the volume of claims submitted by the Providers on an ongoing basis, that all the information needed to evaluate a claim is written on the submitted paperwork, and FSSA issues remittance advice to the Providers on a weekly basis that states the specific reasons each claim was denied, a predeprivation remedy would be inefficient. Further, the authority quoted by the Providers even states that a Medicaid provider has no right to receive funds for claims that are inappropriately billed, which would advise against imposing a structure where the state would need to recover funds that may ultimately prove to be erroneously paid. *Mathews*, 424 U.S. at 334–35, 344–45, 349; *Ellis v. Sheahan*, 412 F.3d 754, 758 (7th Cir. 2005) (describing *Mathews* as requiring comparison of the "costs and benefits of alternative remedial mechanisms," and stating that a postdeprivation hearing that is feasible and provides "a completely adequate remedy" satisfies due process). A postdeprivation remedy that permits the Providers to recover all the money they allege is owed would be an adequate substitute in these circumstances.[30]

_____

[30] To the extent the Providers' argument that FSSA takes too long to review and pay claims may be construed as requesting a predeprivation remedy, this Court declines to do so given that the Providers have not developed this point. The Providers do not cite any authority to support their argument that FSSA takes too long to review and approve its Medicaid claims. Further, the Providers state that "[c]laims currently take five to six months to be processed," but they cite no evidence in the record to support this timeframe. (Pls.' Proposed Findings of Fact & Conclusions of Law 19.) It is true that FSSA's witnesses testified that the FSSA prepayment review team has failed to meet its administrative, self-imposed goal of adjudicating a claim within sixty days after receiving it from Hewlett Packard, who may retain the claim for up to thirty days after receiving it from the Providers, but this does not equate to the five-to-six-month processing time presented. Regardless, without further development by the Providers, this alleged time period does not warrant further attention at this time.

The timeframes stated by the Providers regarding delays in FSSA reviewing claims are also somewhat misleading because the Providers continue to incorporate claims submitted when the state had imposed a payment suspension and the FSSA witness admitted that few claims were being review at that time because the state would not be permitted to pay those claims until the suspension was lifted. The evidence showed that FSSA ultimately denied nearly all of those claims after individualized reviews revealed deficiencies warranting denial. Nonpayment because claims were reviewed and denied is distinct

Since a predeprivation remedy would not be required in this situation, the Court must consider whether FSSA's postdeprivation remedies are sufficient to protect the Providers' interest in the claims they submit to FSSA. "While a plaintiff is not required to exhaust state remedies to bring a § 1983 claim, this does not change the fact that no due process violation has occurred when adequate state remedies exist." *Veterans Legal Def. Fund*, 330 F.3d at 941. A plaintiff who is provided with a state law remedy must utilize those remedies or demonstrate that the state law remedies are inadequate. *Doherty*, 75 F.3d at 323. A court should not reject a state-law remedy as inadequate unless it is "inadequate to the point that it is meaningless or nonexistent, and thus, in no way can be said to provide the due process relief guaranteed by the fourteenth amendment." *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 535 (7th Cir. 2008) (quoting *Easter House*, 910 F.2d at 1406).

Although the Providers allege that they have no opportunity to be heard on their denied claims, their post-hearing filings target specific conduct by FSSA's prepayment review team as evidence that the state remedy offered is inadequate. Specifically, the Providers argue that FSSA's review procedures are arbitrary and based on unwritten criteria because analysts deny claims when the Providers (1) do not include a patient's recipient identification number on the claim;[31] (2) do not include an SA modifier to indicate that a nurse practitioner treated the patient; (3) submit claims that are a "level four" or "level five" complexity; and (4) do not authenticate signatures in a timely manner. The Providers' witnesses testified that they do not believe a legal basis exists to support these denials, and thus, FSSA subjects them to an unfair procedure. Once

_____

from a waiting period between FSSA's receipt of a claim and its individualized review (and being paid if approved).

[31] A recipient identification number is a Medicaid recipient's unique identification number to identify that recipient within the Medicaid system. It was described as the Medicaid equivalent to a social security number.

an FSSA analyst denies a claim, the Providers may consult the remittance advice, make corrections to the claim, and resubmit it to the FSSA analyst. The Providers resubmit claims regularly.

If the Providers' state law remedies ended here, it would be questionable whether procedural due process is afforded. However, resubmitting a denied claim is just the first step in the remedies available to the Providers. Throughout this litigation, FSSA has stated that the Providers are provided multiple appellate mechanisms if they believe an FSSA analyst erroneously denied a Medicaid claim. When a provider's claim is denied payment "due to incorrect or inaccurate billing," after resubmitting the claim the Medicaid provider "may appeal under the provisions of 470 Ind. Admin. Code 1-4." 405 Ind. Admin. Code 1-1-3(a). Those provisions offer the Providers a right to request an administrative hearing on the denial before an administrative law judge (ALJ). 470 Ind. Admin. Code 1-4-3 to 1-4-5. Subsequently, they may seek an agency review of the ALJ's decision. 470 Ind. Admin. Code 1-4-6. Finally, if still dissatisfied, the Providers may seek judicial review. 470 Ind. Admin. Code 1-4-7.

Tellingly, the Providers have not challenged the adequacy of these appellate remedies, nor even acknowledged FSSA's argument that these remedies exist. *Easter House*, 910 F.2d at 1405 (assuming that the state's offered remedies were adequate because the parties gave little attention to the issue); *Kauth v. Hartford Ins. Co. of Ill.*, 852 F.2d 951, 955–56 (7th Cir. 1988) (holding that the plaintiff has not raised a colorable claim that he was denied procedural due process because he did not allege that the available state remedies are constitutionally inadequate). Further, there is no evidence that the Providers have exhausted these state law remedies on any of their denied claims. *Veterans Legal Def. Fund*, 330 F.3d at 941 (denying the plaintiffs' § 1983 claim when the defendants claimed that the plaintiffs had adequate

postdeprivation remedies available, but plaintiffs did not deny these remedies existed and they presented no coherent argument as to their inadequacy); *Doherty*, 75 F.3d at 321, 323 (holding that a plaintiff could not proceed on her procedural due process claim brought under § 1983 because she did not show that she had exhausted her state law remedies or alleged that those remedies were inadequate).

Even the authority cited by the Providers advises that they cannot merely ignore the state law remedies, and then argue in federal court that the state violates their right to procedural due process. In that case, a Medicaid provider's request for a preliminary injunction was denied after Indiana officials terminated the provider's Medicaid certification. *Legacy Healthcare, Inc. v. Feldman*, 11 Fed App'x 589, 589–90 (7th Cir. 2001). After holding that Indiana offered an appellate procedure as required by the relevant federal regulation, the court held that the provider failed to show that the appeals process was "fundamentally unfair" and the provider's "decision to ignore that process is fatal to its case." *Id.* at 595 ("[T]he idea that the plaintiffs could ignore a state procedural remedy and then create a federal procedural due process case 'just makes no sense.'" (citing *Herwins v. City of Revere*, 163 F.3d 15, 20 (1st Cir. 1998))).

Similarly, the Providers' procedural due process claim—that FSSA bars the Providers from "hav[ing] an opportunity to respond and be heard" on the claims denied by the prepayment review team (Br. Supp. Mot. 10)—is not likely to succeed on the merits. To hold otherwise would require this Court to accept the Providers' incorrect statement that absolutely no procedural mechanisms exist under state law, as well as that an alleged unfairness present at the first stage of a multistage appeals process involving different decision-makers suffices to show that the entire framework is fundamentally unfair. The Providers' misconception about the state law remedies that exist and their failure to attack the adequacy of the entire state law appellate

structure precludes their procedural due process claim. *Veterans Legal Def. Fund*, 330 F.3d at

941 ("The whole idea of a procedural due process claim is that the plaintiff is suing because the

state failed to provide adequate remedies. Therefore, we do not require a plaintiff to pursue those

remedies in order to challenge their adequacy, but likewise we do not allow a plaintiff to claim

that she was denied due process just because she chose not to pursue remedies that were

adequate.").

If FSSA's analysts have misapplied the body of rules that govern a Medicaid claim, then

the claims denied should have been paid. The postdeprivation procedures in place under state

law have not been shown to be fundamentally incapable of correcting any erroneous decision by

the FSSA analysts.[32] Therefore, the Providers' procedural due process claim is not likely to

succeed on the merits.

ii. *No Adequate Remedy at Law, Irreparable Harm, and Balancing of Harms*

Even though the Providers not succeeding on the merits means that the Court may stop at

this point, *Adams v. City of Chi.*, 135 F.3d 1150, 1154 (7th Cir. 1998), the Court is encouraged to

address the remaining preliminary injunction requirements, and it will do so here. *Girls Scouts of

Manitou Council*, 549 F.3d at 1089 ("Where . . . a district court decides that a party moving for a

preliminary injunction has not satisfied one of the threshold requirements, we have encouraged

_____

[32] The Providers' witness testified in some detail about the burden created by having to submit paper
records to FSSA through Hewlett Packard, rather than through the electronic submission process it used
before being placed on prepayment review. Although the Court sympathizes with the frustration created
when a more efficient process is replaced by an older, more tedious one, the Providers cite no authority
for their proposition that requiring paper records and the increased processing time accompanying it
constitutes a procedural due process violation "as applied" to the Providers. The testimony at the
evidentiary hearing suggested that FSSA asks all Medicaid providers that are on prepayment review to
mail paper records. Therefore, whether considered on its own or in combination with the other "burdens"
highlighted, there is no procedural due process violation.

the court to conduct at least a cursory examination of all the aforementioned preliminary injunction considerations.").

The Providers claim that FSSA's use of prepayment review deprives them of their Medicaid revenue, which accounts for about 70 percent of the Providers' revenue. The Providers' financial struggles have caused them to lose or layoff several employees, close clinics where the Providers periodically saw patients,[33] and obtain loans and other sources of funding. Overall, the Providers' witnesses testified that NIGCC will imminently close because of its financial condition, with Mr. Bader describing the situation as "horrific, horrific difficult financial doom" and struggling to operate. (Hr'g Tr. vol. 3, 624:16–17.) The Providers contend that a preliminary injunction is necessary to keep their operations running during this litigation.

The Providers are correct that the loss of a business is recognized as an irreparable harm for which no adequate remedy at law exists. *Roland Mach. Co.*, 749 F.2d at 383, 386. Nevertheless, a plaintiff must also make a clear showing that there is more than "only a possibility of irreparable harm." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Unless the movant makes a "persuasive showing of irreparable harm," *Chi. United Indus., Ltd. v. City of Chi.,* 445 F.3d 940, 945 (7th Cir. 2006), such harm remains speculative, *Winter*, 555 U.S. at 21–22; *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 896 (N.D. Ill. 2015) (holding that the movants "have not *conclusively* demonstrated" an irreparable harm or no adequate remedy at law, and denying the preliminary injunction.") (emphasis added); *Khalik v. U.S. Dep't of Agric.*, No. 94 C 5809, 1994 WL 548213, at *2 (N.D. Ill. Oct. 5, 1994) (finding no irreparable harm when the movant did not supply any financial records to support the

---

[33] As previously noted, the Providers would go to Muncie once a month and to South Bend five times a year. On these days, NIGCC's office in Fort Wayne would not see patients.

allegation that his business relied heavily on food stamps and would close if it could not accept them); *Ichiyasu v. Christie, Manson & Woods Int'l, Inc.*, 630 F. Supp. 340, 343 (N.D. Ill. 1986) (denying a preliminary injunction because movant's conclusory allegations of impending insolvency and lack of factual support were insufficient proof of irreparable harm).

The Providers have not left the Court completely "in the dark" about their financial situation, *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010), but the Providers' witnesses who testified to the health of NIGCC's operations offered few insights on its current revenue and expenses. NIGCC's office manager, Mr. Bader, testified that he does "all the finances, and all the related other things, contracting." (Hr'g Tr. vol. 3, 548:14–15.) Despite being presented as the person most knowledgeable on this subject, Mr. Bader could only state the Providers' current revenue by giving a "ballpark estimate average" of $20,000 to $30,000 per month for the last couple months.[34] (Hr'g Tr. vol. 3, 552: 20–553:1.) When the Court inquired as to NIGCC's monthly expenses, Mr. Bader testified that monthly rent is $4,000; a rough estimate for monthly payroll is $16,000; quarterly overhead insurance is $3,500; and NIGCC owes payments of over $1,000 per month on unspecified loans and carries credit card debt.[35]

---

[34] At the close of the hearing, the Court directed each party to file a brief in lieu of an oral closing argument. The Plaintiffs filed their closing argument brief on February 8, 2016. In it, the Plaintiffs attempted to supplement the testimony of Mr. Bader by adding new details that were not elicited during his in-court testimony. Specifically, the brief attempted to give some indication of NIGCC's managed care Medicaid revenue. It also added that since the hearing ended, Mr. Bader has determined that he was talking about pre-tax revenue when estimating monthly revenue. (Br. Supp. Motion 16–17.) Opening and closing arguments are not evidence. Mr. Bader did not testify to these facts, and his attorney submitting new information into the record cannot be considered a summary of evidence in the record. Therefore, these new facts were not considered.

[35] Mr. Bader also testified that the Providers have incurred "like over [$]400,000" in professional fees since 2013. (Hr'g Tr. vol. 3, 670:23–25, 671:1.) Although it not clear how this figure is distributed between fees for accountants, consultants, and attorneys, or how recently these charges were incurred, "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) (internal quotation marks and citation omitted); *Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481, 483 (7th Cir. 2015). NIGCC's witnesses also did not discuss the final overpayment determination that is currently on appeal.

Significantly, Mr. Bader was even less knowledgeable when asked about traditional fee-for-service revenue, which is the portion of Medicaid that FSSA oversees through its prepayment review program. Mr. Bader could not identify how much money the Providers would have earned in December 2015 for treating traditional fee-for-service Medicaid patients, "but for" FSSA's use of prepayment review. Further, despite consistently estimating their patient base as 70 percent Medicaid, Mr. Bader did not state what percentage of these patients receive traditional fee-for-service Medicaid, as opposed to managed care Medicaid. Nor did the Providers submit any evidence regarding income from its non-Medicaid patients, who Mr. Bader testified have commercial payers that pay significantly higher than Medicaid. The Providers submitted no documentary evidence to supplement the non-specific testimony of Mr. Bader about revenue and expenses, both past and current. Mr. Bader could only guess that the last time NIGCC received a monthly accounting report was mid-2013.

In contrast to the Providers' imprecise statements, FSSA offered evidence showing monthly breakdowns of the number of traditional fee-for-service claims reviewed by FSSA and the value of payments made to NIGCC. From September 2015 through December 2015, the FSSA prepayment review team reviewed 1057 claims, of which 699 claims were approved for payment. (Defs.' Hr'g Ex. H.)[36] This resulted in FSSA issuing checks to the Providers totaling $25,341.03, which reflects the value of the Providers' approved claims as allowed by the Medicaid fee schedule.[37] The only NIGCC-generated document presented showing revenue, which FSSA introduced, matched FSSA's calculations for the last four months of 2015.

_____

[36] For the months of September, October, November, and December 2015, NIGCC's accuracy rate on its claims was 74.3%, 55.2%, 78.9%, and 60.1%, respectively.
[37] A Medicaid provider has no limit on the dollar amount that it chooses to bill for a given service. No matter what price a provider assigns to a service, FSSA will only pay the value that the Medicaid fee schedule allows for that service. The Medicaid fee schedule is pre-determined and prepayment review has

Although this four-month figure allows one to extrapolate the Providers' revenue from other sources, Mr. Bader's guesstimates of past monthly revenue makes any number speculative. Again, the Providers offered no evidence showing how many of their Medicaid patients are on traditional fee-for-service Medicaid as opposed to the several MCEs alluded to during the evidentiary hearing. FSSA has no control over payments from MCEs. Around $25,000 from FSSA over four months may not be a lot of money, but this certainly does not render the Providers "virtual indentured servants to FSSA" that are working without being paid. (Reply 13.) The Providers' failure to introduce any evidence showing revenues from the MCE and non-Medicaid patients it is currently treating raises significant concern. *Nat'l Wildlife Fed'n v. U.S. Army Corp of Eng'rs*, No. 14-590-DRH-DGW, 2014 WL 6685235, at *12 (S.D. Ill. Nov. 25, 2014) (finding no irreparable harm because the movant failed to sufficiently show that the conduct complained of was the cause of the alleged injury). As far as this Court has been shown, it is safe to assume that traditional fee-for-service patients are a small portion of the Providers' patient base and provide an equally small portion of the Providers' monthly revenue. The testimony from the Providers' witnesses that NIGCC has lost employees and exhausted loans, along with conclusory statements that NIGCC is in imminent danger of closing due to FSSA's use of prepayment review, have not shown that NIGCC is entitled to a preliminary injunction against FSSA regarding prepayment review. This is not to say that the Providers were required to introduce documentary evidence to prove their financial condition, but one "ballpark estimate

---

no control over the Medicaid fee schedule. The Providers are not challenging the adequacy of the payment rates set by the Medicaid fee schedule. Defendants' Hearing Exhibit H also states dollar amounts associated with the claims that FSSA reviewed and denied, but these values were not adjusted according to the Medicaid fee schedule. Thus, any check that NIGCC would have received for these denied claims would likely have been lower.

average" as to monthly revenue, without any evidence showing other key lines of revenue, does not constitute a clear showing of irreparable harm.

The Providers and FSSA each address the balance of harms and public interest together. Even assuming that the Providers' have shown irreparable harm, because the Providers have not proven that they are likely to prevail on their procedural due process claim, the balance of harms would need to weigh more heavily in their favor. *Girl Scouts of Manitou Council*, 549 F.3d at 1086. The Providers argue that the balance of harms favors them because if NIGCC closes, Fort Wayne will be without a physician-geneticist. NIGCC's Medicaid and non-Medicaid patients will need to go elsewhere for treatment, and this decreased supply of genetic services will result in increased wait times for all patients across the region and the state. Additionally, requiring FSSA to pay all of their claims would be a very small percentage of FSSA's budget.

Even though FSSA has not argued that it will suffer irreparable harm if forced to pay all the Providers' claims without first going through the available state law remedies, *Roland Mach. Co.*, 749 F.2d at 387, the Providers may slightly understate the state's and public's interest in ensuring that taxpayer funds are spent appropriately, s*ee Ill. League of Advocates for the Developmentally, Disabled v. Ill. Dep't of Human Servs.*, 60 F. Supp. 3d 856, 888 (N.D. Ill. 2014). FSSA is a political branch of the government, so "the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Planned Parenthood of Ind.*, 794 F. Supp. 2d at 913 (quoting *Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, 157 F.3d 500, 503 (7th Cir. 1998)). In addition to needing to monitor public money, granting a preliminary injunction here would bypass the state law remedies in place to channel the costs of handling the issues presented by the Providers' procedural due process claim. FSSA does not seriously dispute that patients would have less access to treatment

from a physician-geneticist, but if this preliminary injunction is erroneously denied and NIGCC closes, the state offers free transportation to patients who do not have access to services. Considering these factors using the sliding scale, even if the balance of harms would otherwise slightly favor the Providers, they have not shown that the balance of harms weighs heavily in their favor given the Court's findings on the threshold questions.

The Court finds that the Providers are not entitled to a preliminary injunction on their procedural due process claim. The Providers failed to show a likelihood of success on the merits, that they will suffer irreparable harm, and that no remedy at law exists.

b.      *Patients' Freedom of Choice Claim*

The Patients assert that FFSA applies the prepayment review program in a manner that violates the free-choice-of-provider requirement. § 1396a(a)(23). This conclusion is based on a simple syllogism: (1) FSSA has applied prepayment review in a manner that deprives NIGCC of "substantially all of its Medicaid revenue"; (2) NIGCC depends mainly on Medicaid revenue; (3) without this revenue NIGCC cannot operate; thus, (4) the Patients are deprived of their "freedom of choice." (Pls.' Proposed Findings of Fact & Conclusions of Law 19.)

This novel argument may have merit one day, but the Patients have not explained "why" to this Court. Even though the Patients raised this theory in both their pre-hearing and post-hearing filings, it has not been presented in any greater detail than as summarized above. Nor is it accompanied by citation to any authority. "Given our adversary system of litigation, 'it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.'" *Doherty*, 75 F.3d at 324 (alterations omitted) (quoting

*Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir. 1986)). Considering this, the Court will not reach the Patients' attempt to assert the free-choice-of-provider requirement in this manner.

In the event that this Court is expected to piece together the Patients' presentation by making inferences from the arguments and authorities used by the Plaintiffs on other issues—specifically, the Patients' challenge of Dr. Bader's without cause termination and the Providers' alleged procedural due process violation stemming from denied Medicaid claims—it concludes that the Patients' argument stretches their statutory "freedom of choice" right too far. *Planned Parenthood of Indiana* dealt with a situation where Indiana cancelled its Medicaid contracts with abortion providers and prohibited them from receiving any state-administered funds, which excluded or terminated these providers from Medicaid. 699 F.3d at 967, 969–70, 980. This barred Planned Parenthood from even submitting Medicaid claims; in contrast to this case, where NIGCC could still freely submit Medicaid claims, but those claims would be reviewed individually before being paid with the option to appeal any denied claim. The latter situation imposes a more attenuated interference on the free-choice-of-provider requirement.

The weight of the Patients' argument about prepayment review's interference with the Providers' operations is also lessened by the fact that it rests upon a factual inaccuracy. As shown at the five-day evidentiary hearing, a "two-years-plus failure to pay the Providers for their Medicaid claims" has not occurred. (Mem. Supp. Pls.' Mot. TRO & Prelim. Inj. 20.) Further, allowing the Patients to use their "freedom of choice" to challenge prepayment review would excuse the Providers from using the adequate state law remedies that Indiana has erected. Creating such a loophole when the state has merely switched a provider from postpayment to prepayment review seems overly intrusive and unwarranted.

Congress could not have intended that a patient's "freedom of choice" would function as a sword for a patient to derivatively attack a state's administrative requirements imposed on Medicaid providers to ensure that the patient's providers accurately bill for services. "Statutory interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy." *Commodity Futures Trading Comm'n v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 550 (7th Cir. 2013) (internal quotation marks and citation omitted). A patient's "freedom of choice," § 1396a(a)(23), co-exists with the requirement that a state

> provide for claims payment procedures which . . . provide for procedures of prepayment and postpayment claims review, including review of appropriate data with respect to the recipient and providers of a services and the nature of the service for which payment is claimed, to ensure the proper and efficient payment of claims and management of the program.

§ 1396a(a)(37). The Patients' expansive reading of their "freedom of choice" has the potential to undermine the states' abilities to curb wasteful use of Medicaid funds. The legislative history shows that limiting fraud and abuse was a fundamental objective:

> [Abusive practices] cheat[] taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services. Furnishing excessive services is probably the most costly noncriminal abuse faced by health benefit programs. . . .[I]t is relatively difficult to prove and correct. Since the medical needs of a particular patient can be highly judgmental, it is difficult to identify program abuse as a practical manner unless the overutilization is grossly unreasonable. . . . Program abuse . . . includes activity wherein providers . . . operate in a manner inconsistent with accepted, sound medical or business practices resulting in excessive and unreasonable financial cost to either medicare or medicaid.

H.R. Rep. No. 95-393, pt. 2, at 44, 47–48 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3046, 3050. This competing concern for states to monitor providers' billing practices to ensure appropriate use of taxpayer money, combined with the adequate state law remedies available to

the Providers, shows that the Patients' "freedom of choice" claim is not likely to succeed on the merits.

Regardless, for analyzing whether there is no adequate remedy at law, irreparable harm, and balancing of harms, the same problems exist as were discussed with the Providers' procedural due process claim. Notably, FSSA only has control over an unspecified portion of the Providers' Medicaid patients and the Providers' witness could not provide a clear picture of NIGCC's revenues and expenses. The Patients' request for injunctive relief fails on these grounds.

**3.      *Injunctive Bond***

Federal Rule of Civil Procedure 65(c) states that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The purpose of an injunction bond is to protect the restrained party from damages that it would incur in the event that the injunction was wrongfully issued. *Ty, Inc. v. Publ'ns Int'l, Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002). The amount of the bond is left to the court's discretion. *Gateway E. Ry. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1141 (7th Cir. 1994).

FSSA has not requested a bond or submitted evidence regarding likely damages if Dr. Bader's without cause termination is preliminarily enjoined. Despite the language of Rule 65(c), a district court may waive the injunctive bond requirement if there is no danger that the opposing party will incur any damages from the injunction. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (citing *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882–83 (9th Cir. 2003)). This is the present scenario, and the Patients are not

required to post a bond. *Planned Parenthood of Ind.*, 794 F. Supp. 2d at 921 (waiving the bond requirement when granting Medicaid patients' request to preliminarily enjoin Indiana's termination of Planned Parenthood's Medicaid funding).

## CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion [ECF No. 2] is GRANTED IN PART, and DENIED IN PART. The Motion is granted as to FSSA's without cause termination of Dr. Bader's Medicaid provider agreement, but it is denied as to all other claims.

A preliminary injunction is issued under Rule 65 that enjoins and restrains the Defendants, Dr. John J. Wernert and Joe Moser, their successors, agents, or anyone else working with or on their behalf, from terminating Dr. Bader's Medicaid provider agreement without cause. FSSA is enjoined to take all steps to reinstate Dr. Bader's Medicaid provider agreement effective the date of this Opinion and Order. This preliminary injunction shall remain in effect until further order of the Court or resolution of this case.

SO ORDERED on April 14, 2016.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT